**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

PATRICK ALEXANDER,

                         Plaintiff,                      9:17-cv-309 (BKS/CFH)

v.

ANDREW M. CUOMO, et al.,

                         Defendants.

**APPEARANCES:**

*For Plaintiff:*
Leo Glickman
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue, 3rd Floor
Brooklyn, NY 11217

*For Defendants:*
Eric T. Schneiderman
Attorney General of the State of New York
Gregory J. Rodriguez
Assistant Attorney General, of Counsel
The Capitol
Albany, New York 12224

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.  INTRODUCTION

This litigation arises from several incidents of alleged violence and misconduct following

the escape of David Sweat and Richard Matt from Clinton Correctional Facility ("Clinton") in

June of 2015.  Plaintiff Patrick Alexander, who was an inmate at Clinton at the time of the

escape and who was moved shortly thereafter to Upstate Correctional Facility ("Upstate") and

then to Shawangunk Correctional Facility ("Shawangunk"), brings various causes of action

under 42 U.S.C. § 1983 stemming from events occurring at those facilities against Defendants New York Governor Andrew Cuomo, Acting Commissioner of the Department of Corrections and Supervision ("DOCCS") Anthony J. Annucci, Clinton Superintendent Steven Racette, Upstate Superintendent Donald Uhler, Shawangunk Superintendent Joseph Smith, Sergeant Robert Harrison, Captain Michael Bertone, and Correction Officers Chad Stickney, D. Humphrey, and D. Thacker.  Additionally, Plaintiff names as John Doe defendants various supervisors, investigators, and correction officers at Clinton, Upstate, and Shawangunk, as well as New York State Troopers.  Plaintiff alleges that Defendants deprived him of substantive and procedural due process in violation of the Fourteenth Amendment, retaliated against him in violation of the First Amendment, and subjected him to cruel and unusual punishment in violation of the Eighth Amendment.  (Dkt. No. 1).

The named Defendants now move to dismiss certain of Plaintiff's claims against them under Federal Rule of Civil Procedure 12(b)(6), (Dkt. No. 19), and Plaintiff has opposed the motion, (Dkt. No. 26).  For the reasons that follow, Defendants' motion is granted in part and denied in part.

## II.    BACKGROUND[1]

### A.    Defendant Cuomo at Clinton

On June 6, 2015, corrections officers at Clinton discovered that inmates David Sweat and Richard Matt had escaped from the facility.  (Dkt. No. 1, ¶ 3).  Later that day, Defendant Cuomo "went inside Clinton for a photo-op" and to inspect the scene of the escape.  (*Id.* ¶¶ 10–11, 42). At the time of the escape, Plaintiff was housed in the cell next to Richard Matt's in the "Honor

---

[1] The following facts are taken from the Complaint and assumed to be true for the purposes of this decision.  *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).  As exhibits, Plaintiff has attached a transcript, as well as audio and video recordings of statements by Defendant Cuomo.  (*See* Dkt. Nos. 1-1, 1-2, 1-3).

Block." (*Id.* ¶ 40).[2]  While passing Plaintiff's cell and "[w]ith television cameras in tow," (*id.* ¶ 43), Defendant Cuomo "stuck his face between the bars of Patrick Alexander's cell and taunted sarcastically that the noise 'must have kept you awake with all that cutting.'" (*Id.* ¶¶ 12, 47). Despite the fact that Plaintiff had no information or knowledge about the escape, (*id.* ¶ 49), Defendant Cuomo sarcastically stated to Plaintiff, "Let me guess, you don't know fucking nothin'." (*Id.* ¶ 48).  Defendant Cuomo's remarks frightened Plaintiff, as he believed Defendant Cuomo's "insinuations that [Plaintiff] had knowledge and information about the escape would give corrections officials free rein to use brutality to extract information from him." (*Id.* ¶ 50). Plaintiff alleges that Defendant Cuomo "knew from multiple sources . . . that physical abuse and excessive force were and are endemic to New York State prisons, including and especially Clinton." (*Id.* ¶ 145).

### B.    The June 6, June 8, and June 10, 2015 Incidents

A few hours after Defendant Cuomo's remarks, Plaintiff "heard an officer walking down the gallery with chains dragging on the floor." (*Id.* ¶ 51).  An unknown Defendant corrections officer, who was posted outside the escaped inmates' cells (and had seen several other inmates taken and returned to their cells beaten and injured), stated to Plaintiff, "It sounds like they're coming for another [one]." (*Id.* ¶¶ 51–52).  Plaintiff was then "shackled tightly and taken to a small room between galleries" where three unknown Defendant corrections officers—none wearing "institutionally required nametags"—were waiting. (*Id.* ¶ 53).  Incorrectly assuming that he had information about the escape, the corrections officers held Plaintiff "up by the throat . . . and they began beating him." (*Id.* ¶ 55).  One of the Defendant corrections officers

---

[2] Particularly well-behaved inmates were housed in the Honor Block. (*Id.* ¶ 37).  Honor Block Inmates had special privileges that other inmates did not have. (*Id.*)

placed a plastic bag around Plaintiff's head, "held it tightly around his neck," continued to beat him, and "threatened that if he did anything to report the assault, it would get worse for him." (*Id.* ¶ 56).  During the assault, Plaintiff believed "that the defendant officers were going to kill him.  He could barely breathe."  (*Id.* ¶ 57).  Other Honor Block inmates have reported similar experiences.  (*Id.* ¶ 58).

When Plaintiff was returned to his cell, the same Defendant corrections officer was posted outside of the escaped inmates' cells.  (*Id.* ¶ 59).  That officer "did not obtain medical treatment" for Plaintiff, despite his "obvious and visible injuries."  (*Id.*).  Furthermore, that evening Plaintiff was interrogated by two unknown Defendant New York State Troopers about the escape. (*Id.* ¶ 62).  Despite the fact that he was "bruised, swollen, woozy, bloody, and obviously injured," the Defendant Troopers also "did nothing to obtain medical attention for plaintiff or inquire about how he was injured."  (*Id.*).  They did, however, ask Plaintiff if "he believed he was in danger."  (*Id.*).  Plaintiff responded that he did not because "[r]esponding 'yes' would have led to further assaults."  (*Id.*).

On June 8, 2015, Plaintiff was interrogated a second time by one of the same unknown Defendant corrections officers who had assaulted him on June 6, 2015, along with Defendant Corrections Officer Chad Stickney and another unknown Defendant corrections officer "who was wearing gloves and motioning as if prepared to punch" Plaintiff.  (*Id.* ¶ 64).  Although "[t]heir body language and words were highly threatening," this time Plaintiff was not assaulted. (*Id.* ¶ 66).  Regardless, "the threats caused [Plaintiff] great psychological distress" and caused him to fear for his life—and again, "he was not referred for medical assistance and not given any."  (*Id.* ¶ 65).

Two days later, on June 10, 2015, two unknown Defendant corrections officers removed Plaintiff from his cell and handcuffed him "so tightly that they cut the circulation off from his hands and his fingers turned colors." (*Id.* ¶ 67). "While walking him out of the [cell block], they smashed his head against the metal bars causing pain and further injury to his already injured head." (*Id.*). Plaintiff, along with other Honor Block inmates, was then "strip searched, . . . taunted and spit on . . . further assaulted," and placed in the Segregated Housing Unit ("SHU") at Clinton. (*Id.* ¶ 68). Plaintiff alleges that, on or about June 10, 2015, an unknown Defendant prison administrator, with the approval of Defendants Superintendent Racette and Acting Commissioner Annucci, ordered that Plaintiff be transferred to SHU at Upstate. (*Id.* ¶ 68). None of the Defendants "took corrective action to prevent the obviously foreseeable constitutional assaults against plaintiff, nor intervened to stop such assaults in any of the above enumerated assaults and inflictions of emotional distress." (*Id.* ¶ 69).

### C.     SHU at Upstate

Plaintiff alleges that "SHU at Upstate . . . is used to punish prisoners who egregiously violate prison rules." (*Id.* ¶ 70). After arriving at Upstate, Plaintiff spent "23 hours a day alone in a small cell" where he was provided with only a "mattress and a sheet with urine stains on it." (*Id.* ¶ 72). "He had no change of clothes" and was "not provided with toilet paper, and no implements for personal hygiene. He was forced to remain in this filthy state without access to a shower for days at a time." (*Id.* ¶ 74). Plaintiff was unable to contact a lawyer, a doctor, or his family members, as he was not provided with paper or allowed phone calls. (*Id.* ¶ 76). DOCCS employees placed signs around Plaintiff's cell identifying him as a "Clinton Inmate"—as a result, no one spoke to him for the duration of his time in SHU. (*Id.* ¶ 77).

Despite his requests to see a doctor, Plaintiff received no medical treatment while at Upstate. (*Id.* ¶ 78, 84). And, although he was provided with food, Plaintiff was "so terrorized"

during his time there "that he was afraid to eat and barely ate." (*Id.* ¶ 79). While confined to SHU at Upstate, Plaintiff was interrogated by an unknown Defendant "Special Investigations Investigator" and unknown Defendant State Police officers. (*Id.* ¶ 83). Plaintiff informed them of the June 6, 2015 assault that occurred at Clinton, but the interrogating Defendants "did not refer [Plaintiff] for any obviously needed medical treatment." (*Id.*). Despite the fact that Plaintiff was never alleged to have "broken any rule to justify his detention in SHU under extremely punitive conditions," (*id.* ¶ 80), Plaintiff remained confined in SHU at Upstate until June 25, 2015 in "conditions far worse than for prisoners who are there for legitimate disciplinary reasons," (*id.* ¶ 82).

### D.      Drug Test at Shawangunk

On June 26, 2015, Plaintiff was transferred to Shawangunk Correctional Facility ("Shawangunk"). (*Id.* ¶ 85). There, he was again identified by DOCCS staff as a "Clinton Inmate," was "constantly frisked without legitimate purpose," and "was subject to other such harassments." (*Id.* ¶ 85). On or about August 11, 2015, an article describing Plaintiff's experience at Clinton following the escape was published in the *New York Times*. (*Id.* ¶ 87). On August 25, 2015, Plaintiff signed a consent form to speak with CNN about that same experience. (*Id.* ¶ 87–88). Shortly after signing the consent, Plaintiff was "singled out by Defendant Captain Barton and forced to provide a urine sample for a marijuana test for no legitimate penological purpose and solely in retaliation for agreeing to speak to CNN." (*Id.* ¶ 89).

Although Plaintiff had not "ingested any marijuana or any other illegal narcotic" and had "never been accused of . . . ingesting marijuana while in prison," the urine test "allegedly came back positive." (*Id.* ¶ 90). Plaintiff alleges that Defendant corrections officers Humphrey and Thacker either tampered with the clean sample Plaintiff provided or otherwise falsified the results. (*Id.* ¶ 90–92). As punishment for the allegedly positive test, Plaintiff received thirty

days' confinement to his cell and a ninety-day "prohibition on exercising ordinary inmate privileges like using the phone or commissary." (*Id.* ¶ 93). The purpose of the falsified positive drug test and subsequent punishment was to retaliate "for [Plaintiff's] willingness to speak to the press about Clinton . . . and to prevent him from speaking to the press." (*Id.* ¶ 94).

Plaintiff alleges that he "submitted numerous grievances and sent letters to the Defendant Superintendent[s] and other officials that his safety and security were in serious jeopardy because of threats and harassment by correction officers in connection with the investigations of the escape." (*Id.* ¶ 151).

### E. Report by NYSCA Regarding Brutality and Abuse at Clinton in Connection with the Escape of Matt and Sweat

Plaintiff alleges that the "brutality, abuse and corruption endemic to Clinton Correctional Facility and many New York state prisons has long been known." (*Id.* ¶ 5). In October 2014, an organization that is statutorily mandated to monitor New York State correctional facilities, the New York State Correctional Association ("NYSCA"), "reported that reports of physical abuse by correction officers against inmates was extremely high inside Clinton Correctional Facility." (*Id.* ¶¶ 5–6). Following the escape of Inmates Matt and Sweat, NYSCA published "10 things you need to know about brutality and abuse at Clinton Correctional Facility." (*Id.* ¶ 7). The list included: (i) officers suffocated inmates during interrogations; (ii) there was "severe and widespread brutality in the escape's aftermath"; (iii) inmates were targeted after the escape for reasons unrelated to the escape; (iv) there has been "long standing and ongoing brutality at Clinton"; (v) after inmates are assaulted, they are sent to solitary confinement; (vi) "there is a lack of proper documentation and accountability for abuses"; and (vii) corrections officers "are denying people the most basic rights and living conditions." (*Id.* ¶ 7).

### III.   STANDARD OF REVIEW

To survive a pre-answer motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'"  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'"  *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 U.S. Dist. LEXIS 155140, at *5, 2017 WL 4250513, at *2 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555).  The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).  When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference."  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### IV.   DISCUSSION

#### A.   Personal Involvement of Defendants Cuomo, Annucci, Racette, Uhler, and Smith

Defendants move to dismiss Plaintiff's claims against Defendants Cuomo, Annucci, Racette, Uhler, and Smith on the basis that "they were not personally involved in the alleged Constitutional violations."  (Dkt. No. 19-1, at 3).  Plaintiff responds that these Defendants are "highly ranked state officials" who "cannot avoid liability by washing their hands of any 'personal responsibility' for the alleged acts . . . of abuse that took place" because "there is

simply no way under the circumstances that [they] did not know that they were happening." (Dkt. No. 26, at 1–2).

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). "Rather, the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015). "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). A plaintiff must therefore "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that supervisory personnel may be considered "personally involved" only if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[3] "Conclusory statements and formulaic recitations of

---

[3] In *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's individual actions, has violated the Constitution." The Second Circuit has not yet addressed how *Iqbal* affects *Colon*'s standard for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"); *see also Jamison v. Fischer*, 617 Fed. App'x 25, 28 n.1 (2d Cir. 2015) (affirming the district court's qualified immunity ruling without addressing "whether the district court correctly dismissed the complaint against [the defendant supervisor] for lack of personal involvement"). Because it is unclear whether, or to what

9

the *Colon* factors [that are] wholly unsupported by facts," do not constitute factual support for a supervisory liability claim. *Eldridge v. Kenney*, No. 11-cv-6459, 2014 U.S. Dist. LEXIS 84437, at *2–3, 2014 WL 2717982, at *3 (W.D.N.Y. June 16, 2014).

### 1.      Cuomo

Plaintiff alleges that during Defendant Cuomo's visit to Clinton following the escape, he "put his face between the bars of plaintiff's cell" and made two statements: (i) Defendant Cuomo implied that the escapees "must have kept [Plaintiff] awake with all that cutting," (Dkt. No. 1, ¶ 47); and (ii) Defendant Cuomo "further tormented [Plaintiff] by saying 'let me guess, you don't know fucking nothin'," (*id.* ¶ 48).  Plaintiff further alleges that in a public radio address on September 15, 2015, Defendant Cuomo denied that violence by prison guards was a widespread problem and "justif[ied] violence as a tool to earn 'respect.'"  (*Id.* ¶ 15).  Plaintiff alleges that Governor Cuomo's "words and actions created an environment and set a policy that sanctioned violence to obtain information from inmates," and that his false accusation against Plaintiff on the morning of June 6, 2015 facilitated the assault later that day.  (*Id.* ¶¶ 16, 105).[4]  Plaintiff argues that Defendant Cuomo effectively created a "*de facto* policy of abuse" that encouraged the violence that Plaintiff allegedly endured.  (Dkt. No. 26, at 13).  Plaintiff alleges that Defendants Cuomo's actions violated his Eighth Amendment right to be free from cruel and unusual punishment, both directly and in his supervisory capacity.

The Court does not find a plausible basis to infer from these allegations that Defendant Cuomo had a role in the violence alleged to have been used by the personnel who interrogated

---

extent, *Iqbal* overrules or limits *Colon*, the Court will apply the *Colon* factors, as have other courts in this District. *See Braham v. Perelmuter*, 15-cv-1094, 2017 U.S. Dist. LEXIS 118356, at *35, 2017 WL 3222532, at *12 (D. Conn. July 28, 2017).

[4] As Defendants point out, the comments on September 15, 2015 could not have "created an environment and set a policy that sanctioned" the alleged assaults, as they were made several months later.  (Dkt. No. 1, ¶ 15).

Plaintiff during the investigation of the escape or any of the other alleged constitutional violations.  And Plaintiff's allegation that Defendant Cuomo is liable as a supervisor is similarly inadequate.  While Defendant Cuomo's comments to Plaintiff on the morning of the escape can be read to signal his belief that inmates close to the escapees likely had information about the escape that they would not want to share, it does not follow that the comments "set a policy that sanctioned violence to obtain information from inmates."  (Dkt. No. 1, ¶ 16).  Plaintiff's argument that Defendant Cuomo "knew, or certainly should have known, that his false accusation . . . was an invitation to harm"  (Dkt. No. 26, at 2) is speculative and conclusory and without a sufficient plausible factual basis.  Plaintiff has not plausibly alleged that Defendant Cuomo, as a supervisory official, was personally involved in the constitutional violations alleged under any of the *Colon* theories of liability.  Accordingly, Plaintiff's § 1983 claims against Defendant Cuomo must be dismissed for failure to state a claim.

### 2.      Annucci

Plaintiff alleges that, "as the Acting Commissioner of DOCCS" and "a policymaker and supervisor for all DOCCS employees," (Dkt. No. 1, ¶ 25), Defendant Annucci was responsible for approving Plaintiff's transfer to SHU at Upstate in June 2015, (*id.* ¶ 68).[5]  Defendants correctly note that Defendant Annucci is not named in any of the causes of action contained within the Complaint.  (Dkt. No. 19-1, at 8).  In response, Plaintiff requests that the Court consider his cause of action for supervisory liability as against Defendant Annucci "for purposes

---

[5] In his papers in opposition Plaintiff argues that Defendant Annucci is liable because he was at Clinton with Governor Cuomo on the day of the escape; "it cannot be doubted that Commissioner Annucci was overseeing the investigation of the escape immediately thereafter"; he "should have known excessive force was used on honor block inmates"; and "[h]e also allowed the policy of using excessive force . . . and likely tacitly created the policy." (Dkt. No. 26, at 6).  Although these allegations would also appear to be too speculative and conclusory to plausibly support Defendant Annucci's supervisory liability, the Court has not considered these assertions, which do not appear in the Complaint.  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 285 (S.D.N.Y. 2015) (declining to "consider the new factual assertions Plaintiffs make in their opposition papers").

of resolving the motion." (Dkt. No. 26, at 12). Having done so, the Court finds that these allegations do not plausibly allege that he was personally involved in the alleged constitutional violations Plaintiff alleges, either directly or under any of the other *Colon* theories of supervisory liability. "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 11-cv-1317, 2012 U.S. Dist. LEXIS 25367, at \*22–23, 2012 WL 651919, at \*6 (N.D.N.Y. Feb. 28, 2012). Accordingly, the claim against Defendant Annucci must be dismissed.

### 3.   The Superintendents

Plaintiff alleges that Defendants Racette, Uhler, and Smith, as "Superintendents at Clinton, Upstate, and Shawangunk Correctional Facilities, respectively," (Dkt. No. 1, ¶ 26), "ignored the dangers [to Plaintiff] and thereby tacitly facilitated and condoned the constitutional actions taken by their subordinates," (*id.* ¶ 150). Plaintiff alleges that Defendants Racette, Uhler, and Smith should have been aware of the risk because, following the escape, Plaintiff was among the "highest profile inmates in the system and . . . suspected of having information about a dangerous and high profile escape of prisoners." (*Id.* ¶ 150). Therefore, because of the "obvious nature of what was happening," the Superintendents "should have known and extremely likely did know" that violence was bound to occur following the escape, but that they failed to take "corrective action." (*Id.* ¶ 152). Plaintiff also alleges that the Defendants Racette, Uhler, and Smith knew of the likelihood of the alleged constitutional violations because Plaintiff "submitted numerous grievances and submitted letters to the Defendant Superintendent and other officials" indicating that "his safety and security were in serious jeopardy."[6] (*Id.* ¶ 151).

---

[6] Although Plaintiff claims to have written "numerous" letters and filed grievances, he does not specify the dates of the letters or grievances, to whom they were sent, what information they contained, and what response he received, if any. This allegation is insufficient to establish that there was any failure to remedy or other basis for supervisorial liability. The mere receipt of a letter from an inmate may not be sufficient to generate supervisory liability. *See*

### i.   Racette

Plaintiff alleges that, while housed at Clinton, he suffered various violations of his Eighth Amendment right to be free of cruel and unusual punishment, and that, in his supervisory capacity, Defendant Racette failed to prevent these violations.  (Dkt. No. 1, ¶¶ 103–114, 123– 128, 136–142, 143–157).  The Complaint alleges, *inter alia*, that: (i) Defendant Racette was the policymaker and supervisor of Clinton at the time of the escape, (Dkt. No. 1, ¶ 26); (ii) during the June 6, 2015 interrogation, corrections officers were "not wearing institutionally required name tags," (*id.* ¶ 53); (iii) "dozens" of other inmates housed on Honor Block reported similar experiences, (*id.* ¶¶ 58, 152); and (iv) a September 4, 2015 report by NYSCA documented these similar experiences, (*id.* ¶ 7).  Given the unusual circumstances following this escape and the widespread allegations of beatings and similar conduct, the Complaint plausibly alleges that Defendant Racette had reason to know of the violations and was grossly negligent or deliberately indifferent in failing to prevent them.  *See Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) ("[S]upervisory liability may be imposed when an official has actual or constructive notice of unconstitutional practices and demonstrates 'gross negligence' or 'deliberate indifference' by failing to act."); *see also Groves v. Davis*, No. 11-cv-1317, 2014 U.S. Dist. LEXIS 132782, at *31, 2014 WL 4684998, at *14 (N.D.N.Y. Aug. 11, 2014).  Accordingly, at this early stage of the case, dismissal is not warranted.

### ii.   Uhler

Plaintiff alleges that, his transfer to SHU at Upstate without any hearing or due process and the repugnant conditions at the Upstate SHU deprived him of his Eighth Amendment right to

---

*Petty v. Goord*, No. 00-cv-803, 2002 U.S. Dist. LEXIS 21197, at *26, 2002 WL 31458240, at *8 (S.D.N.Y. Oct. 31, 2002); *Gonzales v. Wright*, No. 06-cv-1424, 2010 U.S. Dist. LEXIS 15953, at *28, 2010 WL 681323, at *10 (N.D.N.Y. Feb. 23, 2010); *cf. Grullon v. City of New Haven*, 720 F.3d 133, 140–41 (2d Cir. 2013).

be free from cruel and unusual punishment and his Fourteenth Amendment right to substantive and procedural due process.  (Dkt. No. 1, ¶¶ 115–118, 119–122, 123–128).  Plaintiff alleges that Defendant Uhler is liable for the violations as well as for failing to prevent these violations in his capacity as supervisor.  (*Id.* ¶ 115-117, 120-121, 151–158).  Defendant Uhler is alleged to have conspired with John Doe Upstate officials: to subject Plaintiff to "prison conditions in the SHU that are repugnant to the conscience of mankind," (*id*. ¶ 116); and to deprive Plaintiff of his right to be free from deprivation of liberty without due process, (*id*. ¶ 120).  Plaintiff argues that Defendant Uhler was personally involved with these violations under the third, fourth, and/or fifth theories of involvement as set forth by *Colon*, because Defendant Uhler "instituted and maintained a policy of keeping the Clinton Honor Block inmates in such inhumane conditions." (Dkt. No. 26, at 11–12).  And even if Defendant Uhler did not create such a policy, Plaintiff argues, the violations alleged "could only be a product of gross negligence or deliberated [sic] indifference on the part of Uhler" because the Honor Block inmates were "high profile" and "under intense pressure to offer information about a high profile escape."  (*Id.*).  Even if the Complaint plausibly alleges that the Upstate Superintendent would have known that the Honor Block inmates were being transferred to SHU at Upstate, there are insufficient factual allegations to plausibly show that he knew about the process that led to their transfer or that he knew of the allegedly unconstitutional conditions during Plaintiff's fifteen-day stay at the Upstate SHU.  Nor are the allegations sufficient for a plausible conspiracy claim.  Accordingly, Plaintiff's claims against Defendant Uhler must be dismissed.

### iii.    Smith

Plaintiff argues that Defendant Smith is liable in his supervisory capacity for the alleged First Amendment retaliation that occurred while he was housed at Shawangunk.  (Dkt. No. 1,

¶¶ 85–95, 150, 155, 156).  The Complaint, however, is devoid of any factual basis from which to infer Defendant Smith's personal involvement with the alleged violation.  All of the allegations against him are purely conclusory, and accordingly, the claims against Defendant Smith must be dismissed.

### B.    Claims of Threats and Harassment Against Defendant Stickney

Defendants move to dismiss Plaintiff's Eighth Amendment claim against Defendant Stickney on the basis that, "[w]ithout more, allegations of threats and harassment fail to state an actionable claim under the Eighth Amendment."  (Dkt. No. 19-1, at 14).  Plaintiff alleges that Defendant Stickney participated in the June 8, 2015 interrogation, during which Plaintiff was questioned by Defendant Stickney and two unknown corrections officers with "highly threatening" words and body language, which caused Plaintiff "anguish and stress that he would be beaten again."  (*Id.* ¶ 65).  The John Doe correction officer who put a bag over his head and suffocated him on June 6 was present in the room, and a large John Doe Correction officer who was wearing gloves motioned as if prepared to punch Plaintiff.  (*Id.* ¶ 64).  "One of them" threatened that they were not "through with him," and that he "would be beaten again."  (*Id*. ¶ 65).  Plaintiff alleges that, "knowing that other inmates were being assaulted and tortured, the threats caused him great psychological distress."  (*Id.*).  Although Plaintiff has not identified any specific conduct by or words uttered by Defendant Stickney, he alleges that Stickney and the John Doe Corrections officers deprived "and conspired to deprive" Plaintiff of his right to be free from cruel and unusual punishment.[7]

---

[7]  Plaintiff does not allege that Defendant Stickney participated in the June 6, 2015 interrogation and assault, nor does Plaintiff allege that Defendant Stickney assaulted him during the June 8, 2015 interrogation or at any other time.

Allegations of verbal harassment or abuse, without an allegation of an actual injury, are insufficient to support a § 1983 claim. *Johnson v. Eggersdorf*, 8 Fed. App'x 140, 143 (2d Cir. 2001) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)).  The intentional infliction of psychological pain may constitute an Eighth Amendment violation only if the pain is not de minimis. *See Jermosen v. Coughlin*, No. 87-cv-6267, 1993 U.S. Dist. LEXIS 9283, at *19–20, 1993 WL 267357 at *6 (S.D.N.Y. July 9, 1993), *aff'd*, 41 F.3d 1501 (2d Cir. 1994) (finding that officers' approach "with their nightsticks raised in a threatening position was not enough to cause the degree of psychological pain which rises to the level of a constitutional violation"); *Greene v. Mazzuca*, 485 F. Supp. 2d 447, 451 (S.D.N.Y. 2007) (being yelled at, spit at, and threatened with time in the SHU, without an allegation of serious injury or damage, did not rise to the level of a § 1983 claim).  In this case, Plaintiff has alleged that he was "significantly psychologically injured," and his prayer for damages includes a lengthy description of his emotional trauma, which included depression and loss of sleep.  (Dkt. No. 1, ¶¶ 102(g), 107, 110).  While ultimately this may well be determined to be de minimis, given the severity of the alleged conduct, i.e., the assault on June 6, the presence of some of the same officers on June 8, the alleged beatings of other Honor Block inmates, and the conduct on June 8, as well as Plaintiff's alleged harm, the Court finds that at this point it is premature to dismiss the injurious threats cause of action (Count Two) as to Officer Stickney.

### C.   First Amendment Claims Against Defendants Bartone, Humphrey, and Thacker

Defendants move to dismiss Plaintiff's First Amendment retaliation claims against Defendants Barton, Humphrey, and Thacker.  They contend that Plaintiff has failed to allege that Defendants knew that Plaintiff had signed a consent form, and thus failed to adequately demonstrate any causal connection between his protected speech and the alleged constitutional

16

violations.  (Dkt. No. 19-1, at 23).  Plaintiff responds that a causal connection is demonstrated by the fact that "the timing of the urine test and its falsified results are indicative of knowing retaliation."  (Dkt. No. 26, at 16).

In order to prove a First Amendment retaliation claim a prisoner must show: "(1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action."  *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)).  To establish adverse action, the plaintiff must show conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Gill*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  A causal connection may be inferred from the temporal proximity between the time of the grievance and the adverse action.  *Espinal*, 558 F.3d at 129.  A First Amendment retaliation claim does not exist where the defendant had no knowledge of the allegedly protected speech. *See Skates v. Incorporated Village of Freeport*, 265 F. Supp. 3d 222, 236 (E.D.N.Y. 2017).

The parties do not dispute the first two elements of Plaintiff's First Amendment retaliation claim, agreeing that: (i) Plaintiff's consent form expressing his intention to speak with the press constitutes protected speech, (Dkt. No. 19-1, at 16); and (ii) falsifying the results of a drug screening test for the purpose of having an inmate confined to his cell for thirty days constitutes an adverse action, (*id*.).  The parties disagree, however, whether Plaintiff has adequately pleaded facts sufficient to reasonably infer a causal connection between the two—in other words, whether Defendants conducted the drug test and falsified the results because Plaintiff had agreed to speak to the press.  Plaintiff alleges that: (i) hours after he signed a consent form agreeing to speak with CNN about his experience at Clinton, Defendant Bartone

17

required him to submit to a urinalysis screen for marijuana for no penological purpose "and solely in retaliation for agreeing to speak to CNN," (Dkt. No. 1, ¶ 89); (ii) Plaintiff had not used marijuana or ever been accused of using marijuana while in prison, (*id.* ¶ 90); (iii) Defendant Humphrey placed Plaintiff's urine sample, "or another urine sample" in a freezer to await testing, (*id.* ¶ 91); (iv) Defendant Thacker tested Plaintiff's sample and "was responsible for reporting the false positive result," (*id.* ¶ 92); (v) Bartone, Humphrey and Thacker falsely alleged that the test was positive in retaliation for Plaintiff's attempt to speak to the press (*id.* ¶ 132); and (vi) as punishment, Plaintiff was confined to his cell and prohibited from using the phone, which prevented him from speaking to the press, (*id.* ¶ 94).  These allegations, considered in the light most favorable to Plaintiff, are sufficient to permit the inference that Defendants Bartone, Humphrey, and Thacker subjected Plaintiff to a drug test and falsified the results with retaliatory animus.  Accordingly, Defendants' motion is denied with respect to Plaintiff's retaliation claims against Defendants Bartone, Humphrey, and Thacker.

### D.      Eighth Amendment Deliberate Medical Indifference Claims

Defendants move to dismiss Plaintiff's Eighth Amendment deliberate medical indifference claims against Defendants Racette and Stickney, primarily on the basis that Plaintiff has failed to allege that he suffered from any "serious medical need" that could give rise to a claim of deliberate medical indifference.  (Dkt. No. 19-1, at 18–19).  Plaintiff responds that, although he "cannot provide a contemporaneous diagnosis of the full extent of his injuries because he was denied medical attention . . . [h]e knows he was beaten up very badly, strangled, and suffocated.  He knows he was badly injured."  (Dkt. No. 26, at 17).

A claim of deliberate indifference to serious medical needs has an objective prong and a subjective prong.  *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).  To establish a claim of deliberate medical indifference, the objective component requires a plaintiff to allege

that the deprivation was "sufficiently serious," while the subjective component requires a plaintiff to allege that the defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834, 842 (1994). "The objective component requires that 'the alleged deprivation must be sufficiently serious in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011); *see Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013). Factors that should be considered in assessing whether a medical need is sufficiently serious include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

Here, Plaintiff has failed to allege facts sufficient to state either element of a deliberate medical indifference claim. Plaintiff alleges that after the assault on June 6, 2015, "[h]e was bruised, swollen, woozy, bloody, and obviously injured." (Dkt. No. 1, ¶ 62). Plaintiff has insufficiently alleged the requisite condition of urgency. District courts within the Second Circuit have repeatedly held that similar allegations are not sufficiently serious to support Eighth Amendment liability. *See Dallio v. Herbert*, 678 F. Supp. 2d 35, 60–61 (N.D.N.Y. 2009) (two black eyes, bruised kidney, open lacerations, and numbness in the extremities not sufficiently serious); *Stephanski v. Arnone*, No. 04-cv-552, 2008 WL 413301, at *10 (W.D.N.Y. Feb. 13, 2008)[8] (pain and bruises not sufficiently serious); *Jones v. Furman*, No. 02-cv-939, 2007 U.S. Dist. LEXIS 20336, at *28–29, 2007 WL 894218, at *10 (W.D.N.Y. Mar. 21, 2007) (soreness,

---

[8] Lexis citation not available.

pain, lump on head, and bruising to back, ribs, and legs not sufficiently serious); *Rodriguez v. Mercado*, No. 00-cv-8588, 2002 U.S. Dist. LEXIS 16057, at \*22–25, 2002 WL 1997885, at \*8 (S.D.N.Y. Aug. 28, 2002) (bruises to head, back, and wrists not sufficiently serious); *Gill v. Jones*, No. 95-cv-9031, 2001 U.S. Dist. LEXIS 17674, at \*23, 2001 WL 1346012, at \*7 (S.D.N.Y. Nov. 1, 2001) (headaches, earaches, and dizziness together with facial bruising not sufficiently serious); *cf. Riles v. Bannish*, No. 10-cv-652, 2010 WL 3169391, at \*4, 2010 U.S. Dist. LEXIS 80920, at \*11 (D. Conn. Aug. 11, 2010) (finding allegations that doctor denied pain medication, after plaintiff complained of excruciating pain, and failed to timely diagnose and treat the plaintiff's broken nose were sufficient to state a claim of deliberate indifference). Significantly, Plaintiff does not plead what injuries he sustained, what treatment he needed and did not receive, whether he suffered chronic pain or any other medical condition as a result of the failure, for how long any such pain or condition persisted, or whether he has any permanent injuries following the assault. Accordingly, the Complaint does not allege that the injuries sustained were sufficiently serious.

In any event, the Complaint also fails to adequately allege that either Defendant Racette or Stickney knew that their failure to provide Plaintiff with prompt medical treatment posed a substantial risk of serious harm to plaintiff. *Hathaway*, 99 F.3d at 552 (holding that the subjective component requires that "the charged official must act with a sufficiently culpable state of mind," which "is the equivalent of criminal recklessness"). Significantly, Plaintiff does not allege that Defendant Racette saw or interacted with Plaintiff in any capacity following the alleged assault, or otherwise suggest that that he knew of Plaintiff's condition. And, although Plaintiff alleges that he experienced pain after the assaults, he does not allege that he told either Defendant Racette or Defendant Stickney. *See Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.

1998) ("The deliberate indifference standard requires the plaintiff to prove that the prison official knew of and disregarded the plaintiff's serious medical needs.").

Accordingly, Plaintiff's deliberate medical indifference claims against Defendants Racette and Stickney are dismissed.

### E.    Failure to Intercede Claim

Finally, Defendant moves to dismiss Plaintiff's failure to protect claim as to Defendant Stickney on the basis that Defendant Stickney did not have a "realistic opportunity to intervene on plaintiff's behalf" because he was not present during either alleged assault.  (Dkt. No. 19-1, at 24).  Plaintiff responds that Defendant Stickney "knew of the risk to [Plaintiff] because he actually told [Plaintiff] that the assaults 'weren't over.'"  (Dkt. No. 26, at 19 (quoting Dkt. No. 1, ¶ 138)).  Plaintiff has alleged that Stickney was "in a position to prevent the assaults against plaintiff from happening," and that he had "a reasonable opportunity to intervene by reporting the conduct or otherwise stop others from engaging in unconstitutional conduct."  (Dkt. No. 1, ¶ 24).

"A correction officer who is present while an assault upon an inmate occurs may bear responsibility for any resulting constitutional deprivation, even if he did not directly participate." *McFadden v. Herman*, No. 9:09-CV-1415 TJM/ATB, 2012 U.S. Dist. LEXIS 186157, at *6, 2012 WL 7169948, at *2 (N.D.N.Y. July 11, 2012), *report and recommendation adopted*, No. 9:09-CV-1415, 2013 U.S. Dist. LEXIS 21230, 2013 WL 598986 (N.D.N.Y. Feb. 15, 2013).  A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008).  Although

Plaintiff acknowledges that Defendant Stickney was not present during any of the incidents during which he was allegedly assaulted, the Court is unable to determine at this early stage of litigation whether Defendant Stickney's statement that the assaults "weren't over" indicates that he had a realistic opportunity to prevent the harm that later occurred to Plaintiff on June 10, 2015.  Accordingly, Defendants' motion to dismiss the failure to intervene claim against Defendant Stickney is denied.

> **F.     Defendant Harrison**

Defendants moves to dismiss Plaintiff's claims against Defendant Harrison on the basis that the allegations against him are "spurious and conclusory."  (Dkt. No. 19-1, at 20).  Plaintiff acknowledges that he "pleads no cause of action against Sergeant Harrison."  (Dkt. No. 26, at 24).  Accordingly, Plaintiff's claims against Defendant Harrison are dismissed with prejudice.

## V.    LEAVE TO AMEND

Defendants seek dismissal of the Complaint with prejudice.  (Dkt. No. 19-1, at 32).  In general, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint."  *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  The Court will permit Plaintiff a limited opportunity to amend the Complaint in accord with this decision.

## VI.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 19) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's claim against Defendant Harrison is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's claims against Defendants Cuomo, Annucci, Uhler, and Smith are **DISMISSED without prejudice**; and it is further

**ORDERED** that Plaintiff's Eighth Amendment deliberate medical indifference claim (Sixth Cause of Action) against Defendants Racette and Stickney is **DISMISSED without prejudice**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 19) is otherwise **DENIED** in all other respects; and it is further

**ORDERED** that Plaintiffs **may amend the Complaint <u>within THIRTY (30) days</u>** of the date of this Order, in accordance with the conclusions stated above.

**IT IS SO ORDERED.**

Dated: February 26, 2018
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

23