UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

PATRICK ALEXANDER,

                                            Plaintiff,

                      -against-

STEVEN RACETTE, SUPERINTENDENT OF
CLINTON CORRECTIONAL FACILITY; DONALD
QUINN, FIRST DEPUTY SUPERINTENDENT OF
CLINTON CORRECTIONAL FACILITY; STEPHEN
BROWN DEPUTY SUPERINTENDENT FOR
SECURITY OF CLINTON CORRECTIONAL
FACILITY; DONALD UHLER, SUPERINTENDENT OF
UPSTATE CORRECTIONAL FACILITY;  EARL BELL,
DEPUTY SUPERINTENDENT FOR SECURITY;
CORRECTION OFFICER CHAD STICKNEY; CAPTAIN
BARTONE; CORRECTION OFFICER D. HUMPHREY;
CORRECTION OFFICER D. THACKER; CORRECTION
OFFICER JASON HANSON; CORRECTION OFFICER
AND INVESTIGATOR DONALD H. MITCHELL; JOHN
DOE SUPERVISOR IN CHARGE OF THE
SEGREGATED HOUSING UNIT AT UPSTATE
CORRECTIONAL FACILITY; JOHN DOE
DECISIONMAKER TO PLACE CLINTON INMATES IN
UPSTATE SHU; JOHN DOE SUPERVISOR IN
CHARGE OF INTAKE AT UPSTATE CORRECTIONAL
FACILITY; JOHN DOE SUPERVISORS AT CLINTON,
UPSTATE AND SHAWANGUNK CORRECTIONAL
FACILITIES  ##1-25; JOHN DOE OFFICE OF SPECIAL
INVESTIGATIONS INVESTIGATORS ##1-5; JOHN
DOE STATE TROOPERS ##1-9; JOHN DOE
CORRECTION OFFICERS AT CLINTON AND
UPSTATE CORRECTIONAL FACILITIES ##1-48,

                                     Defendants.

------------------------------------------------------------------------ X

**SECOND AMENDED
COMPLAINT AND
JURY DEMAND**

Docket No.    17CV309 BKS-
CFH

ECF CASE

## INTRODUCTION

1.    On June 5, 2015, Patrick Alexander's day ended like every other day as an inmate on the honor block at Clinton Correctional Facility.  He went to sleep in his cell.

2.    On the morning of June 6, 2015, Patrick Alexander had woke up for the morning count when correction officers had just noticed that David Sweat and Richard Matt were missing.

3.    For the public, June 6 was the day they learned that David Sweat and Richard Matt had absconded from Clinton C.F. and that they were a serious threat to public safety.  After a yearlong investigation, the public found out that the escape was due to the spectacular incompetence and corruption of correction officials, employees of the State of New York.

4.    For Patrick Alexander, June 6 was a surrealist's nightmare.  He found out that two inmates he knew well had managed to escape their maximum security prison, he was cursed at and taunted by the Governor of the State of New York, and finally, just a few hours later, he was brutally interrogated, beaten and suffocated by correction officers concerned and angered that their own incompetence and corruption might be exposed.

## STATE OF DENIAL

5.    The brutality, abuse and corruption endemic to Clinton Correctional Facility and many New York State prisons has long been known.  The New York State Correctional Association ("NYSCA") is mandated by statute to monitor correctional facilities in the State.  All state correctional facilities are required to allow NYSCA representatives to visit said facilities at their pleasure.

6.    In October, 2014 NYSCA reported that reports of physical abuse by correction

officers against inmates was extremely high inside Clinton Correctional Facility.[1]

7.   On September 4, 2015, NYCSA published "10 things you need to know about brutality and abuse at Clinton Correctional Facility"[2] in connection with the escape of Richard Matt and David Sweat.  Their list is as follows:

    a.   **Officers are Suffocating People During Interrogations**

    b.   **There was Severe and Widespread Brutality in the Escape's Aftermath**

    c.   **People were Targeted Post-Escape for Reasons Unrelated to the Escape**

    d.   **There has been Longstanding and Ongoing Brutality at Clinton**

    e.   **After being Assaulted, People are Sent to Solitary Confinement**

    f.   **There is a Lack of Proper Documentation and Accountability for Abuses**

    g.   **COs are Denying People the Most Basic Rights and Living Conditions**

    h.   **Racism and Dehumanization are at the Core of All of the Abuses**

    i.   **People at Clinton have been Held in Solitary Confinement for Decades**

    j.   **Not Just Clinton: Beating, Maiming, and Torture Occurs Across NY Prisons**

8.   Despite the evidence and pleas from the state's legislatively mandated correctional monitoring organization, and countless complaints from inmates and their families, press coverage of abuses, investigations that reveal abuse, notices of intent to sue and lawsuits, New York is in a state of denial.

9.   Indeed, while Richard Matt and David Sweat were missing, in his own state of denial about the corruptibility of correction officers, Governor Cuomo stated:  "I would be shocked if a correction official if a guard was actually involved. And that's putting it mildly."

---

[1] The report can be found at http://www.correctionalassociation.org/wp-content/uploads/2015/03/Clinton-Correctional-Facility-Final-Draft-2.pdf

[2] The report can be found at http://www.correctionalassociation.org/news/10-things-you-need-to-know-about-brutality-and-abuse-at-clinton-c-f

## GOVERNOR ANDREW M. CUOMO

10. On a day in which every resource should have been devoted to the capture of the escapees, defendant Governor Andrew Cuomo went inside Clinton for a photo-op, requiring that resources be expended for his security and escort, as well as the trailing staff and cameras.

11. Plaintiff Patrick Alexander was inside his cell watching the spectacle of the Governor of the State of New York "inspecting" the area.

12. Then, with TV cameras and microphones in tow, the Governor Cuomo stuck his face between the bars of Patrick Alexander's cell and taunted sarcastically that the noise "must have kept you awake with all that cutting.'" *See* Ex. "A". Tellingly, he made no such public inquiry of correction officers who were paid by taxpayers to listen for noises that would indicate illegal activity. Governor Cuomo further said to him, in a threatening voice and a tough guy look, "let me guess, you don't know fucking nothin'."

13. Immediately after the escape was discovered a sergeant asked him if he heard anything going on the night before. Mr. Alexander told him truthfully that he did not hear anything and did not know anything about what had happened. Apparently, Governor Cuomo did not believe him.

14. On the early morning of June 8, 2015, while Sweat and Matt were still missing, and plaintiff and other Honor Block inmates were being tortured and abused, the Governor signaled to correction officers and the public on CNN with the following wholly unfounded statement:

> "You have three basic types of employees in a prison. You
> have the correction officers, the guards, civilian employees
> and private contractors who come in to do private
> contracting work. …I would be shocked if a guard was

involved. And that's putting it mildly. But, we're looking at the civilian employees now and the private contractors to see if, possibly, a civilian employee or a contractor was assisting this escape. Because they wouldn't have had the equipment on their own. That's for sure."[3]

Exhibit B.

15.  On September 15, 2015 Defendant Governor Andrew Cuomo appeared to endorse the use of undue violence by correction officers.  In denying that violence by prison guards was a widespread problem in New York, he added, as if to justify violence as a tool to earn "respect" that "they [correction officers] have to make sure they get a certain amount of respect in the job, otherwise they get hurt"[4]  Exhibit C.

16.  Governor Andrew Cuomo's words and actions created an environment and set a policy that sanctioned violence to obtain information from inmates, and his utterly misplaced confidence – in the face of such obvious evidence of at least massive incompetence by correction officials, if not worse – created an environment and policy of impunity for correction officers.

17.  And, having obtained that grant of impunity, correction officers pounced.  Just hours after Governor Cuomo had finished his show and the cameras were gone, an evening of guard inflicted medieval barbarism ensued.  Patrick Alexander was one of the victims, all of whom told similar stories of the guards' *modus operandi* and brutality.

## PRELIMINARY STATEMENT

18.  This is a civil rights action in which plaintiff seeks relief for the violation of his rights by correction officers and other employees and/or contractors in their personal capacities under the First, Eighth and Fourteenth Amendments of the United States

---

[3] http://www.cnn.com/TRANSCRIPTS/1506/08/nday.03.html
[4] http://www.northcountrypublicradio.org/news/story/29516/20150915/cuomo-says-new-york-prisons-don-t-have-brutality-problem

Constitution secured by 42 U.S.C. §1983.

19.   The claim arises from a series of incidents in which defendant correction officials engaged in a pattern of harassment, intimidation, and assault, causing plaintiff to suffer injury while in the custody of the New York State Department of Correction and Community Supervision ("DOCCS") at Clinton Correctional Facility.

20.   Plaintiff seeks monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

21.   This action is brought pursuant to 28 USC §1331 and 42 USC §§1983 and 1988.

22.   Venue is laid within the United States District Court for the Northern District of New York in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Northern District of New York.

## PARTIES

23.   Plaintiff Patrick Alexander was a prisoner in the custody of the DOCCS at Clinton, Upstate and Shawangunk Correctional Facilities at all relevant times herein.

24.   Defendant Superintendent Racette was at all times relevant herein the Superintendent of Clinton Correctional Facility.  As such, he was a policy maker and supervisor for Clinton C.F.  Defendant Superintendent Racette acted under color of law and in his capacity as an employee/agent of the State of New York.  He is sued in his individual capacity.

25.   Defendant First Deputy Superintendent Donald Quinn served in that position at all times here relevant.  As such, he was a policy maker and supervisor for Clinton C.F.

Defendant Deputy Superintendent Donald Quinn acted under color of law and in his capacity as an employee/agent of the State of New York. He is sued in his individual capacity.

26. Defendant Deputy Superintendent of Security Stephen Brown served in that position at all times here relevant. As such, he was a policy maker and supervisor for Clinton C.F. Defendant Deputy Superintendent of Security Stephen Brown acted under color of law and in his capacity as an employee/agent of the State of New York. He is sued in his individual capacity.

27. Defendant Superintendent Uhler was at all times relevant herein the Superintendent of Upstate Correctional Facility. As such, he was a policy maker and supervisor for Upstate C.F. Defendant Superintendent Uhler acted under color of law and in his capacity as an employee/agent of the State of New York. He is sued in his individual capacity.

28. Defendant Correction Officers Chad Stickney, Jason Hanson and Donald H. Mitchell were at all times relevant herein correction officers in the employ of DOCCS and present at Clinton C.F. during relevant times. These Defendants acted under color of law and in their capacity as an employees/agents of the State of New York. They are sued in their individual capacity.

29. Defendant Captain Bartone and Correction Officers D. Humphrey and D. Thacker were at all times relevant herein correction offices in the employ of DOCCS at Clinton C.F. Defendants Bartone, Humphrey and Thacker acted under color of law and in his capacity as an employee/agent of the State of New York. They are sued in their individual capacities.

30.   Defendant John Doe in Charge of SHU at Upstate C.F. was at all times here relevant a Supervisor at Upstate C.F.  As such, he was a policy maker for and had supervision over the SHU.  This Defendant acted under color of law and in his capacity as an employee/agent of the State of New York.  He is sued in his individual capacity.

31.   Defendant John Doe Decisionmaker to place Clinton inmates in Upstate SHU was at all times here relevant a Supervisor and policy maker for DOCCS.  Defendant John Doe Decisionmaker acted under color of law and in his capacity as an employee/agent of the State of New York.  He is sued in his individual capacity.

32.   Defendant John Doe Supervisor in charge of Intake at Upstate Correctional Facility was at all times relevant Supervisors at DOCCS who had supervision over the intake of inmates at their respective facilities.  These defendants acted under color of law and in their capacities as employees/agents of the State of New York.  They are sued in their individual capacities.

33.   Defendant John Doe Supervisors at Clinton, Upstate and Shawangunk Correctional Facilities were at all times here relevant supervisors at said facilities.  As such, they had supervisory and/or policy making responsibility at their respective facilities.  These defendants acted under color of law and in their capacities as employees/agents of the State of New York.  They are sued in their individual capacities.

34.   Defendant John Doe OSI Investigators were at all times here relevant investigators who were responsible for investigating and interviewing potential witnesses about the circumstances of the escape.  Said defendants witnessed injuries on Plaintiff but failed to take action. These defendants acted under color of law and in their capacities as employees/agents of the State of New York.  They are sued in their individual capacities.

35.   Defendant John Doe State Troopers were at all times here relevant responsible for investigating and assuming law enforcement responsibilities at correctional facilities after the escape. Said defendants witnessed injuries on Plaintiff but failed to take action. These defendants acted under color of law and in their capacities as employees/agents of the State of New York.  They are sued in their individual capacities.

36.   Defendant John Doe Correction Officers were at all times here relevant correction officers working in Clinton and Upstate Correctional Facilities, respectively. These defendants acted under color of law and in their capacities as employees/agents of the State of New York.  They are sued in their individual capacities.

## **FACTUAL ALLEGATIONS**

### THE DAY OF THE ESCAPE

37.  On June 5, 2015, Patrick Alexander was an inmate in the custody of DOCCS.  He was incarcerated at the Clinton C.F. and housed in the "Honor Block".  The Honor Block was a portion of the facilities' A block.

38.  The Honor Block was where particularly well behaved inmates were housed. Inmates in the Honor Block had special privileges other inmates did not have.

39.  Patrick had worked a long day of overtime at the Tailor 5 shop on June 5, and did not return to his cell until 9:45 pm.  He was exhausted and went to sleep.

40.  At about 5:15 a.m., he was roused from his sleep from the commotion outside of his cell.  Apparently, correction officers had just discovered that Richard Matt and David Sweat were not in their cells.

41.  David Sweat and Richard Matt's cells were next to each other.  Patrick

Alexander's was next to Richard Matt's.

42.  The facility was on lockdown after the discovery.  Patrick, like all other inmates, could not leave his cell.

43.  Later that morning, at about 11 a.m. defendant Governor Andrew M. Cuomo arrived at Clinton C.F.

44.  With television cameras in tow, defendant Cuomo "inspected" the scene.

45.  Mere hours after the escape, precious law enforcement resources were diverted to plan the governor's visit and provide security for him and his entourage.

46.  Upon information and belief, defendant Cuomo has no law enforcement, corrections, or military experience.

47.  Nevertheless, in the course of his "inspection", he saw fit to directly address Patrick Alexander, who was still inside his cell attempting to mind his business as the spectacle was going on just outside.

48.  Defendant Cuomo put his face between the bars of plaintiff's cell and challenged him, sarcastically remarking "they must have kept you awake with all that cutting".  See ex. A.

49.  The Governor further tormented him by saying "let me guess, you don't know fucking nothin'."  The Governor then gave him a tough guy look, and moved on.

50.  The truth was that plaintiff Patrick Alexander knew nothing about the escape.

51.  Plaintiff Patrick Alexander, already disconcerted and unnerved by the escape and his proximity to it, became frightened by the governor's taunting.  Plaintiff believed that his insinuations that he had knowledge and information about the escape would give correction officials free rein to use brutality to extract information from him.

### THE JUNE 6 ASSAULT

52.  And it did.  Just a few hours later, he heard an officer walking down the gallery with chains dragging on the floor.  A Defendant John Doe Correction Officer, posted in front of Sweat and Matt's cells (now a crime scene), told him "it sounds like they're coming for another."

53.  The correction officer had seen other inmates leave and come back obviously injured.

54.  "They" were coming for the plaintiff.  He was shackled tightly and taken to a small room between galleries.  There were three correction officers inside, Defendants Jason Hanson and Donald Mitchell and a John Doe Correction Officer, one wearing a Crisis Intervention Unit vest.  They were not wearing institutionally required name tags. He did not recognize these officers.

55.  There was a plastic bag hanging off of an outcropping from the wall.  One of the officers asked "do you know what that's for"?  They also threatened to waterboard him.

56.  While still shackled, he was held up by the throat by one of the officers and they began beating him and questioning him, assuming, like defendant Governor Cuomo, that he had information about the escape.  He repeatedly exclaimed that he did not know anything while struggling to breathe.

57.  Then one of the officers put the plastic bag over his head and held it tightly around his neck.  They continued to beat him.  They threatened that if he did anything to report the assault, it would get worse for him.

58.  During the assault, plaintiff believed, reasonably, that the defendant officers were going to kill him.  He could barely breathe.

59. After the assault ended, he was dragged back to his cell. He was bleeding and obviously badly injured. Other Honor Block inmates have reported a very similar experience.

60. The Defendant John Doe Officer was still stationed by Alexander's cell. He did not obtain medical treatment for his obvious and visible injuries.

61. Their assault on Patrick Alexander, as well as on other inmates, were an attempt to deflect blame for the escape away from the incompetence and corruption of prison officials and on to the inmates.

62. Defendant Governor Cuomo's false accusations against Patrick Alexander similarly were an attempt to deflect attention away from state employee culpability, which could prove embarrassing to his administration.

63. Later that same evening, he was interviewed by State Trooper Investigator Rebecca Finn and a John Doe State Trooper about the escape. He was bruised, swollen, woozy, bloody and obviously injured. Neither Finn nor the John Doe State Trooper asked if he needed treatment, or ask him what happened. Rather, they asked if he believed he was in danger. Fearing for his life, he said "no". Responding "yes" would have led to further assaults.

64. Finn and the John Doe State Trooper did nothing to obtain medical attention for plaintiff or inquire about how he was injured.

65. On or about June 8, plaintiff was taken from his cell, shackled, and taken to the disciplinary office. Inside was a large Defendant John Doe Correction Officer who was wearing gloves and motioning as if prepared to punch the plaintiff. In addition, the John Doe Defendant Correction Officer who put a bag over his head and suffocated him on

June 6 was present in the room and Defendant Correction Officer Chad Stickney.

66.  These three officers interrogated him again. Their body language and words were highly threatening in order to cause plaintiff anguish and stress that he would be beaten again.  One of them threatened that they were not "through with him" and that he would be beaten again.  After the June 6 ordeal and being prevented from seeing medical staff, and further, knowing that other inmates were being assaulted and tortured, the threats caused him great psychological distress.  He reasonably feared for his life.

67.  Despite being obviously recently injured, and despite the presence of one officer who had beaten him, he was not referred for medical assistance and not given any. However, they did not assault him.

68.  On the evening of June 10, 2015, two John Doe Correction Officers took him out of his cell and handcuffed him.  They cuffed him so tightly that they cut the circulation off from his hands and his fingers turned colors.  While walking him out of the company, they smashed his head against the metal bars causing pain and further injury to his already injured head.

69.  Other Honor Block inmates were rounded up. They were all strip searched, and while naked they were taunted and spit on by numerous Defendant John Doe Correction Officers, including plaintiff.  Plaintiff was further assaulted.  Defendant John Doe Decisionmaker to Place Inmates in Upstate Segregated Housing Unit ("SHU") ordered that they be transported to the SHU of Upstate C.F.  Upon information and belief, Defendant Superintendent Racette and Acting Commissioner Annucci approved the transfer.

70.  No John Doe Supervisors or Correction Officers took corrective action to prevent

the obviously foreseeable unconstitutional assaults against plaintiff, nor intervened to stop such assaults in any of the above enumerated assaults and inflictions of emotional distress.

## TREATMENT AT UPSTATE CORRECTIONAL FACILITY

71.   The SHU at Upstate C.F. is used to punish prisoners who egregiously violate prison rules.

72.   SHU is a restrictive form of incarceration where prisoners spend 23 hours a day alone in a small cell, receive fewer privileges other inmates routinely receive.

73.   When he arrived at Upstate, the only items he had in his cell were a mattress and a sheet with urine stains on it.

74.   His personal items were never delivered to Upstate C.F.

75.   He had no change of clothes.  He was not provided with toilet paper, and no implements for personal hygiene. He was forced to remain in this filthy state without access to a shower for days at a time.

76.   He was given no books and no other items for his cell that are normally given to SHU inmates.

77.   He was given no paper, writing instrument or anything to write a letter or otherwise communicate.  He was not allowed phone calls.  He was being held incommunicado.

78.   To increase the isolation, signs made by DOCCS officials were posted around his area of the SHU that identified him as a "Clinton inmate" and said, in sum and substance that no one was allowed to speak to them.  No one did speak to him.

79.   In addition, despite asking to see a doctor he was not treated by any medical

professional of prison official. He was even denied the sick call forms to go to the clinic.

80. He was given food but was so terrorized that he was afraid to eat and barely ate.

81. As stated above, Patrick Alexander resided in the Honor Block at Clinton because of his exemplary disciplinary record and good behavior. Plaintiff had not, nor was it even alleged that he had broken any rule to justify his detention in SHU under extremely punitive conditions. He was given no opportunity to challenge his confinement.

82. Rather, he and others were placed in SHU to cover up the crimes of correction officers and make sure they were isolated from the outside world – including lawyers – so the outside world could not hear their complaints and could not observe their injuries, including doctors.

83. He remained in SHU under extremely and extraordinarily inhuman conditions until June 25 – conditions far worse than for prisoners who are there for legitimate disciplinary reasons face.

84. Superintendent Donald Uhler and Deputy Superintendent of Security Earl Bell knew or clearly should have known of the conditions in the SHU that plaintiff was forced to endure. Superintendent Uhler is mandated by DOCCS Directive 4933, Section II(D) to visit the SHU at least "once per week" to inspect conditions. Similarly, other members of his "executive team", which would have included Deputy Superintendent of Security Earl Bell, are required by this provision to visit the SHU once per week.

85. Furthermore, given the extraordinary notoriety of the Clinton honor block inmates being held there, defendants Uhler and Bell knew or clearly should have known that their health and safety could be compromised.

86. At Upstate he was interviewed by a Defendant John Doe Special Investigations

15

Investigator and Defendant John Doe State Police officers. He told them about the June 6

assault by correction officers. They did not refer him for any obviously needed medical

treatment.

87. Despite being obviously injured and asking for medical assistance, he was denied

any medical attention at Clinton C.F. and Upstate C.F.

### TREATMENT AT SHAWANGUNK CORRECTIONAL FACILITY

88. On June 26, 2015, the day Richard Matt was killed by State Troopers, he was

transported to Shawangunk C.F.

89. After he arrived, he was called and labelled a "snitch" by correction officers and

harassed as one of the "Clinton inmates". He was constantly frisked without legitimate

purpose and was subject to other such harassments.

90. Around August 11, when Mr. Alexander's experience at Clinton C.F. was

published in the *New York Times*, Sergeant Harrison mocked him as a snitch and verbally

and physically abused him for speaking to the media.

91. Around August 25, 2015, Mr. Alexander signed a consent form to speak about his

experience at Clinton C.F. with CNN.

92. Hours later, still on August 25, Mr. Alexander was singled out by Defendant

Captain Bartone and forced to provide a urine sample for a marijuana test for no

legitimate penological purpose and solely in retaliation for agreeing to speak to CNN.

93. Though Patrick Alexander had not ingested any marijuana or any illegal narcotic,

and further, had never been accused of infracted for ingesting marijuana while in prison,

his urine sample allegedly came back positive.

94. Defendant C.O. Humphrey had custody of Mr. Alexander clean urine sample and

16

placed it, or another urine sample, in the freezer to await testing.

95. Defendant C.O. Thacker tested either Mr. Alexander's clean urine sample or a different dirty urine sample, and was responsible for reporting the false positive result of the sample.

96. He was infracted for the positive marijuana test, and received 30 days confinement to his cell and a 90 day prohibition on exercising ordinary inmate privileges like using the phone or commissary.

97. The test, the false positive alleged results, and the punishment were in retaliation for his willingness to speak to the press about Clinton C.F. and to prevent him from speaking with the press.

98. On September 16, 2015, DOCCS issued a memorandum to all DOCCS employees, stating "[a]n inmate who has been interviewed by representatives of the news media shall not be subject to departmental discipline or any other adverse action"

## EXHAUSTION OF REMEDIES

99. Plaintiff exhausted all administrative remedies available to him for each incident.

## THE INSPECTOR GENERAL REPORT

100. On June 6, 2016, the Inspector General produced a report, incorporated here by reference, identifying gross incompetence, negligence and a dereliction of duty by guards and supervisors. Though the scope of the report was only to "determine all factors potentially involved in the escape" and to make recommendations to prevent further escapes, it also points out that crimes were committed by correction officials and that, in the course of the investigation, correction officials lied under oath.

101. Nevertheless, upon information and belief, only one correction official has been

prosecuted for any crime in connection with the escape or its aftermath, Correction

Officer Eugene Palmer, the one caught red-handed. He smuggled in tools used for the

escape and gave them to Matt, gave Matt and Sweat advance warning about cell searches,

and performed other improper and illegal acts to facilitate the escape. He also destroyed

evidence after the escape. Palmer even bragged to investigators that he had such a close

and trusting relationship with Richard Matt that Matt had vowed to "kill any inmate who

assaulted Palmer." For these crimes and this conduct, he worked out a deal with the

local District Attorney for a six month sentence. He served four months in a local jail

and was released.

102. Upon information and belief no criminal charges have been brought by the

Clinton County District Attorney's Office for the criminal brutality and torture

perpetrated by correction officers in an attempt to cover up officer culpability in the

escape. Reports of an FBI investigation of narcotics trafficking by correction officers at

Clinton have also, upon information and belief, led to no criminal charges.

103. Defendant Governor Cuomo's unjustified, overly broad public support of Clinton

correction officers, in addition to his irresponsible direct false accusation against Patrick

Alexander, assured them that the torture, physical abuse and harassment they inflicted on

inmates in the aftermath of the escape would go unpunished.

104. The Governor's words encouraged and emboldened the chain of command below

him to engage in brutality and misconduct, and was a contributing cause of the injury to

the plaintiff and numerous other inmates.

## DAMAGES

105. As a direct and proximate result of the acts of defendants, plaintiff suffered the

following injuries and damages:

    a.   Violation of his right to Due Process of Law under the Fourteenth Amendment to the United States Constitution;

    b.   Violation of his right under the Eighth Amendment to be free from cruel and unusual punishment;

    c.   Violation of his right under the First Amendment to freedom of speech, including retaliation for exercising free speech;

    d.   Deprivation of liberty;

    e.   Deprivation of property;

    f.   Physical pain and suffering; and

    g.   Emotional trauma and suffering, including fear, emotional distress, frustration, fright, horror, grief, depression, loss of sleep, and increased levels of anxiety.

### FIRST CAUSE OF ACTION – ASSAULT ON JUNE 6, 2015
(Violation of Plaintiff's Eighth Amendment Right under the Constitution of the United States to be free from Cruel and Unusual Punishment)

106.      The above paragraphs are here incorporated by reference.

107.      Defendant Correction Officers Jason Hanson and Donald Mitchell and John Doe Clinton Correction Officers acted under color of law and deprived and conspired to deprive plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment under the Eighth Amendment when they assaulted and terrorized him.

108.      Defendants Andrew M. Cuomo and John Doe Correction Officers ##1-3 acted with malicious intent, purposefulness and/or deliberate indifference and are liable to

plaintiff under 42 U.S.C. §1983.

109.     Plaintiff was physically and emotionally injured and has been damaged by

defendants' wrongful acts.

### SECOND CAUSE OF ACTION – INJURIOUS THREATS ON JUNE 8, 2015
(Violation of Plaintiff's Eighth Amendment Right under the Constitution of the United
States to be Free from Cruel and Unusual Punishment)

110.     The above paragraphs are here incorporated by reference.

111.     Defendant Correction Officer Chad Stickney and John Doe Clinton Correction

Officers acted under color of law and deprived and conspired to deprive plaintiff of his

civil, constitutional and statutory rights to be free from cruel and unusual punishment

under the Eighth Amendment when they threatened him so severely that he was

significantly psychologically injured.

112.     Such threats were connected to actual assaults that occurred on June 6 and June

10, two days before and after the threats.

113.     Defendant John Doe Clinton Correction Officers acted with malicious intent,

purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C.

§1983.

**114.**     Plaintiff was emotionally injured and has been damaged by defendants' wrongful

acts.

### THIRD CAUSE OF ACTION – ASSAULT ON JUNE 10, 2015
(Violation of Plaintiff's Eighth Amendment Right under the Constitution of the
United States to be free from Cruel and Unusual Punishment)

115.    The above paragraphs are here incorporated by reference.

116.    Defendants John Doe Clinton Correction Officers acted under color of law and

deprived and conspired to deprive plaintiff of his civil, constitutional and statutory rights

to be free from cruel and unusual punishment under the Eighth Amendment when they

assaulted and terrorized him.

117.    Defendant John Doe Clinton Correction Officers acted with malicious intent,

purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C.

§1983.

118.    Plaintiff was physically and emotionally injured and has been damaged by

defendants' wrongful acts.

### FOURTH CAUSE OF ACTION – SUBJECTION TO PRISON CONDITIONS "REPUGNANT TO THE CONSCIENCE OF MANKIND" BY UPSTATE C.F. PRISON OFFICIALS
(Violation of Plaintiff's Eighth Amendment Right under the Constitution of the United States to be free from Cruel and Unusual Punishment and/or his Fourteenth Amendment Right to be Free from Violations of (Substantive) Due Process of Law)

119.    The above paragraphs are here incorporated by reference.

120.    Defendants Superintendent Donald Uhler, Deputy Superintendent of Security

Earl Bell, and John Doe Upstate C.F. Official in Charge of SHU and John Doe Correction

Supervisors and Officers acted under color of law and conspired to deprive plaintiff of his

civil, constitutional and statutory right to be free from cruel and unusual punishment

under the Eighth Amendment and/or due process of law under the Fourteenth

Amendment when they subjected Plaintiff subjecting him to prison conditions in the SHU

that are repugnant to the conscience of mankind.

121.    Uhler and Bell each were required by DOCCS Directive 4933 to conduct once per week visits to the SHU.  The John Doe Official in Charge of SHU, Supervisors and Officers are required to do frequent rounds each day to ensure, *inter alia*, the safety, health and minimum welfare of the SHU inmates.

122.    Defendants Uhler, Bell, John Doe Upstate C.F. Official in charge of SHU and John Doe Supervisors and Officers acted with malicious intent, purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C. §1983.

123.    Plaintiff was physically and emotionally injured and has been damaged by defendants' wrongful acts.

### FIFTH CAUSE OF ACTION – PLACEMENT IN PUNITIVE CONDITIONS WITHOUT DUE PROCESS OF LAW BY UPSTATE C.F. PRISON OFFICIALS
(Violation of Plaintiff's Fourteenth Amendment Right under the Constitution of the United States to be free from Deprivation of Liberty Without (Procedural) Due Process of Law)

124.    The above paragraphs are here incorporated by reference.

125.    Defendants John Doe Upstate C.F. Official in charge of SHU and John Doe Decisionmaker to Transport Clinton Inmates to Upstate C.F. SHU acted under color of law and conspired to deprive plaintiff of his civil, constitutional and statutory right to be free from a deprivation of liberty without due process of law under the Fourteenth Amendment when, without offering any hearing or resort to legal processes, they caused plaintiff to be confined to the SHU in conditions below conditions incident to general prison life and to even below the normal conditions of the already low standard of ordinary SHU life.

126.    These Defendants acted with malicious intent, purposefulness and/or deliberate indifference and are liable to plaintiff under 42 U.S.C. §1983.

127.     Plaintiff was physically and emotionally injured and has been damaged by

defendants' wrongful acts.

### SIXTH CAUSE OF ACTION – DENIAL OF RIGHT TO FREE SPEECH AND RETALIATION

(Violation of Plaintiff's First Amendment Right to Freedom of Speech and Retaliation for
attempting to exercise His Right to Free Speech at Shawangunk C.F.)

128.     The above paragraphs are here incorporated by reference.

129.     Hours after plaintiff signed a consent form to speak to the media outlet CNN

about the incidents at Clinton C.F., Defendant Captain Bartone retaliated against his plan

to exercise his free speech rights by requiring that he take a urine test.

130.     Defendants had no reason to believe that plaintiff had ingested marijuana or any

narcotics.  The test was administered to prevent him from speaking to the press.

131.     In retaliation for trying to speak to the press, and to prevent him from doing so,

Defendant Captain Bartone, along with Defendant Correction Officers Humphrey and

Thacker at Shawangunk falsely alleged that his test was positive.

132.     The falsely alleged positive result resulted in a further curtailment of his liberties

and privileges as an inmate and caused him to suffer an undue curtailment of his First

Amendment right to free speech.

133.     Defendants' purposeful infringement on Plaintiff's free speech rights caused him

to suffer constitutional violations and are liable to plaintiff under 42 U.S.C. §1983.

134.     Plaintiff was physically and emotionally injured, his liberty was curtailed, and he

was prevented from exercising a right and has been damaged by defendants' wrongful

acts.

### SEVENTH CAUSE OF ACTION – FAILURE TO INTERCEDE

(Violation of Plaintiff's Eighth Amendment Right to be Free from Cruel and Unusual

Punishment by Failing to Intervene in the Obvious Unconstitutional Acts
of Other Officers)

135.    The above paragraphs are here incorporated by reference.

136.    Defendants Correction Officers Chad Stickney, Jason Hanson, Donald Mitchell,

Correction Officer John Doe State Troopers, John Doe Clinton C.F. Supervisors, and

John Doe Correction officers were aware of the unconstitutional assaults that were

occurring at Clinton C.F. to Honor Block inmates.

137.    Stickney knew because he told plaintiff that the assaults "weren't over". He

knew they were occurring and did nothing to stop them.  In fact, he contributed to

plaintiff's anguish with his threat, which came to pass during the June 10 assault.

138.    The John Doe State Trooper 1 knew because upon hearing the chains as officers

were coming down the corridor, he stated "they're coming for someone else".  He saw

other inmates come back bloody and injured.

139.    Both Stickney and John Doe State Trooper were in a position to prevent the

assaults against plaintiff from happening.  They had a reasonable opportunity to intervene

by reporting the conduct or otherwise stop others from engaging in unconstitutional

conduct, but failed to do so.

140.    All these defendants knew of the brutality that was occurring immediately after

the escape.  Yet they did nothing to intercede in their fellow officers unconstitutional

conduct and they are therefore liable under 42 U.S.C. §1983.

141.    Plaintiff was physically and emotionally injured and has been damaged by

defendants' wrongful acts.

### EIGHTH CAUSE OF ACTION -- SUPERVISORY LIABILITY
(Violation of Plaintiff's Eighth Amendment Right under the Constitution of the United
States to be free from Cruel and Unusual Punishment)

142.     The above paragraphs are here incorporated by reference.

143.     Governor Cuomo created a *de facto* policy of abuse against any inmate who it was perceived by officials was likely to know about the escape.  He was deliberately indifferent to and/or actually facilitated the said constitutional violations injuring plaintiff.

144.     He and Defendants Superintendent Racette and John Doe Supervisors of Clinton, Upstate and Shawangunk C.F. and the Supervisor in charge of Upstate SHU and knew from multiple sources, including but not limited to reports by the Correctional Association of New York (as well as press reports, lawsuits, notices of intent to sue, and complaints from inmates and their advocates) that physical abuse and excessive force were and are endemic to New York State prisons, including and especially Clinton C.F.

145.     Governor Cuomo created a condition and a *de facto* policy that Honor Block prisoners who did not know about the escape were not to be believed, and should be taunted and dehumanized when he spoke to plaintiff in a taunting, dubious and dehumanizing way.

146.     Governor Cuomo's conspicuous accusation against an inmate, and his conspicuous absence of any suspicion or accusation towards correction officials, implied that the Governor – the highest official of the state – "had their back" and they could act with impunity at least during the escape investigation.

147.     Furthermore, Governor Cuomo's unfounded statement of trust that he would be "shocked" if a correction officer was involved in the escape signaled to correction officers that they alone were above reproach and that they would avoid inquiry into their actions and therefore could act with impunity.

148.     Governor Cuomo demonstrated his earlier intent to enable correction officers to

engage in abusive measures when he linked the use of violence to gaining the "respect"

of inmates in September, 2015.

149.     In addition, Defendant Superintendent Racette and Supervisors of Clinton,

Upstate and Shawangunk C.F. and the Supervisor in charge of Upstate SHU were aware

of the particular dangers faced by Clinton Honor Block inmates such as plaintiff.  They

knew about the escape and knew of plaintiff's proximity to the escape.  They knew about

the massive media coverage of the escape and the deep embarrassment of correction

officials who allowed the escape to happen. For a time, plaintiff and the other block

inmates were the highest profile inmates in the system and were suspected of having

information about a dangerous and high profile escape of prisoners. Yet, through

deliberate indifference with malicious intent or gross negligence, they ignored the

dangers and thereby tacitly facilitated and condoned the unconstitutional actions taken by

their subordinates. If they were somehow ignorant of these inmates and the pressures and

dangers they faced, which would strain all credulity, then they were willfully ignorant

and grossly negligent.

150.     Plaintiff submitted numerous grievances and sent letters to the Superintendents

of Clinton, Upstate and Shawangunk Correctional Facilities and other officials that his

safety and security were in serious jeopardy because of threats and harassment by

correction officers in connection with the investigations of the escape.  The

Superintendent and Supervisor Defendants were aware of Plaintiff's realistic, plausible

and highly foreseeable concerns, but again, failed to take any corrective action.

151.    Dozens of inmates who were in the honor block or who worked in the tailor shop were brutally interrogated, beaten, and tortured by prison guards in an attempt at retribution and cover up.[5] The Superintendent and Supervisor defendants should have known and extremely likely did know of such activities.  If they did not know it could only be attributed to willful ignorance. Despite the obvious nature of what was happening, the Superintendent and Supervisor defendants took no corrective action, despite obvious actions that could be taken such as monitoring by themselves and their top deputies around the clock, and requests that the Inspector General and outside agencies

152.    Furthermore, brutal, unconstitutional correction practices had taken place for years at Clinton C.F. and other maximum security prisons as documented by the New York State Correctional Association.  It was likely that under the extraordinary circumstances of the escape, the media attention, the embarrassment to correction officers, and the implicit public encouragement by Governor Cuomo himself, that such brutality would occur or was occurring against inmates, especially those with knowledge of the persons and relations between the escapees, prison workers, and correction officers.  Nevertheless, no corrective actions were taken.

153.    Corrective action by the Supervisory defendants would have prevented the assault and subsequent unconstitutional abuses and harassment that took place against plaintiff.

154.    The Superintendents of Clinton, Upstate and Shawangunk C.F., the John Doe Supervisor in charge of Upstate SHU, and John Doe Supervisors knew that the select

---

[5] http://www.nytimes.com/2015/08/12/nyregion/after-2-killers-fled-new-york-prisoners-say-beatings-were-next.html

inmates like plaintiff who were housed in the Honor Block and who worked in Tailor Shop 1 were particularly vulnerable under the circumstances of the escape aftermath. They knew by his letters and grievances that he was targeted. Nevertheless, they failed to take any corrective action.

155.     The above described failure to supervise demonstrated a deliberately indifferent and/or grossly negligent attitude towards the inmates who suffer constitutional violations at the hands of correctional officer subordinate to the superintendents of Clinton, Upstate and Shawangunk C.F. and the Supervisor in charge of Upstate SHU and the other John Doe Supervisors was the cause of the violation of plaintiff's rights here alleged.

156.     These Defendants have damaged plaintiff by their failure to properly supervise, discipline, review, remove or correct the illegal and improper acts of their subordinate officers.

157.     Plaintiff has been damaged as a result of the wrongful, grossly negligent and illegal acts of the supervisory defendants and are liable to liable to plaintiff under 42 U.S.C. §1983.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

A.     In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

B.     Awarding plaintiff punitive damages in an amount to be determined by a jury;

C.    Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

D.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:    May 2, 2018
             New York, New York        Respectfully yours,

/S/

TO:    ALL NAMED DEFENDANTS    By: Leo Glickman
                                       Stoll, Glickman & Bellina, LLP
                                       Attorneys for Plaintiff
                                       475 Atlantic Avenue 3rd Floor
                                       Brooklyn, NY  11217
                                       (718) 852-3710
                                       (718) 852-3586
                                       lglickman@stollglickman.com