**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――

PATRICK ALEXANDER,

|                        | Plaintiff,                     | 9:17-cv-309 |
|------------------------|--------------------------------|-------------|
|                        |                                | (BKS/CFH)   |

v.

STEVEN RACETTE, Superintendent of Clinton Correctional
Facility; Captain BERTONE;[1] Correction Officer D.
HUMPHREY; Correction Officer D. THACKER; Correction
Officer JASON HANSON; Correction Officer and Investigator
DONALD H. MITCHELL; JOHN DOE Supervisor in Charge
of the Segregated Housing Unit at Upstate Correctional Facility;
JOHN DOE Decisionmaker to Place Clinton Inmates in Upstate
SHU; JOHN DOE Supervisor in Charge of Intake at Upstate
Correctional Facility; JOHN DOE Supervisors at Clinton,
Upstate and Shawangunk Correctional Facilities ##1–25; JOHN
DOE Office of Special Investigations Investigators ##1–5;
JOHN DOE State Troopers ##1–9; JOHN DOE Correction
Officers at Clinton and Upstate Correctional Facilities ##1–48,

Defendants.

―――――――――――――――――――――――――――

**Appearances:**

*For Plaintiff:*
Leo Glickman
Stoll, Glickman & Bellina, LLP
475 Atlantic Avenue 3rd Floor
Brooklyn, New York 11217

*For Defendants Steven Racette, Donald Mitchell, Michael Bertone, Dylan Humphrey,*
*and David Thacker:*
Letitia James
Attorney General of the State of New York
Gregory J. Rodriguez
Assistant Attorney General
The Capitol
Albany, New York 12224

―――――――――――――――――

[1] Plaintiff identified this Defendant as "Captain Bartone" in the Complaint, but the Defendant's last name is "Bertone."
(Dkt. Nos. 57, 84-6). The Clerk is directed to correct the spelling on the docket.

*For Defendant Jason Hanson:*
Ryan E. Manley
Harris, Conway & Donovan, PLLC
50 State Street, 2nd Floor
Albany, New York 12207

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

Plaintiff Patrick Alexander brings this action under 42 U.S.C. § 1983, alleging that various New York State Department of Corrections and Community Supervision ("DOCCS") superintendents, supervisors, investigators, and correction officers violated his First, Eighth, and Fourteenth Amendment rights in the aftermath of David Sweat and Richard Matt's escape from Clinton Correctional Facility ("Clinton" or the "Facility"). (Dkt. No. 57). As relevant here, Plaintiff alleges that Defendants Steven Racette and Jason Hanson, among others, violated his Eighth Amendment right to be free from excessive force. (*Id.*). Defendants Steven Racette and Jason Hanson move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.[2] (Dkt. Nos. 80, 84). Plaintiff opposes their motions. (Dkt. Nos. 89, 90). For the reasons that follow Defendant Racette's motion is granted and Defendant Hanson's motion is denied.

---

[2] Defendants Donald Mitchell, Michael Bertone, Dylan Humphrey, and David Thacker also sought summary judgment and dismissal of Second Amended Complaint as it pertains to claims against them. (Dkt. No. 84-1, at 4). In his response papers, Plaintiff states that he "has determined to not oppose the summary judgment motion as to Defendant Mitchell and as to Point II of Defendants' Memorandum of Law" – seeking dismissal of the First Amendment claim. (Dkt. No. 89, at 6). The Court therefore deems those claims abandoned, and Mitchell is dismissed as a defendant in this case. As Bertone, Humphrey, and Thacker are the only Defendants named in connection with the First Amendment claim, and are not named as Defendants elsewhere, (Dkt. No. 57, ¶¶ 128–34), they, and the First Amendment claim, are dismissed from the case.

II.     **FACTS**[3]

A.     **The Escape**

At some point in the overnight between June 5 and June 6, 2015, David Sweat and Richard Matt, inmates in the Honor Block (A Block)[4] at the Facility, escaped. (Dkt. No. 80-10, at 31). DOCCS officials discovered the escape in the "very-early morning of June 6, 2015." (*Id.* at 31–32).

B.     **Plaintiff – Interviews and Alleged Excessive Force**

At the time of the escape, Plaintiff was an inmate in Clinton, and was housed on the top floor of the Honor Block in a cell adjacent to Richard Matt's cell. (Dkt. No. 80-1, ¶ 2; Dkt. No. 90-1; Dkt. No. 80-7, at 20, 29). Plaintiff became aware of the escape at 5:20 a.m., on June 6, 2015, the time of "the mandatory count," "[f]rom the commotion" of "[o]fficers running around back and forth screaming." (Dkt. No. 80-7, at 21–22). "Sergeants, lieutenants, and correction officers" "started going back and forth between the two cells next to" Plaintiff. (*Id.* at 27–28). They asked Plaintiff why he "didn't . . . go with" the escapees. (*Id.* at 28). At that point, Plaintiff, who had a television in his cell, started watching the escape coverage. (*Id.* at 29). Plaintiff had "passing conversation[s]" with the officers "stationed in front of" the escapees' cells. (*Id.*).

That afternoon, New York Governor Andrew Cuomo walked through the Honor Block. (*Id.* at 31). Plaintiff testified that the Governor "stuck his face in [Plaintiff's] gate and said, they must have kept you up all night with all that cutting, huh? Then he said, oh, let me guess, you

---

[3] The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 80-1, 84-3), Plaintiff's responses thereto (Dkt. Nos. 89-1, 90-1), and the attached affidavits, declarations, exhibits, and depositions. The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[4] The Honor Block (Block A) is "a block for inmates who ha[ve] been misbehavior-report free for a period of time," is comprised of three floors, and houses approximately 200 inmates. (Dkt. No. 80-9, at 67–68). Inmates in the Honor Block receive a "few extra privileges," including permission to be "[o]ut of cell in the evening for T.V. or cooking." (Dkt. No. 89-7, at 16).

fuckin' don't know anything." (*Id.* at 32). Plaintiff did not respond. (*Id.*). The other inmates in the Honor Block were also in their cells when the Governor walked through. (*Id.* at 33). The State Police "kept coming through the Honor Block" and they turned off all the televisions so that the inmates could not watch the news. (*Id.* at 34).

Following the discovery of the escape, multiple government and law enforcement agencies, including DOCCS officials and members of the Crisis Intervention Unit ("CIU"),[5] Clinton correction officers, the New York State Police, the Bureau of Criminal Investigation, the Plattsburgh City Police, and the Office of Special Investigations began conducting interviews at Clinton. (Dkt. No. 80-1, ¶ 38; Dkt. No. 80-9, at 42; Dkt. No. 90-1). Plaintiff observed inmates being escorted to interviews "[a]ll day long" and returning to their cells unable to breathe and with physical injuries "[a]ll day long." (Dkt. No. 80-7, at 91). Plaintiff testified that he was interviewed four times on June 6, 2015, and that he was subjected to the excessive use of force during the third interview.[6] (Dkt. No. 80-1, ¶¶ 3, 5, 13–15; Dkt. No. 90-1).

### 1.     First Interview

Plaintiff's first interview was with the New York State Police. (Dkt. No. 80-7, at 34). Two correction officers escorted Plaintiff to the interview, which was "on the bottom floor," in the "bubble of 4 company"—the area "where they have the lockbox to open all the cells." (*Id.* at 35–36). Plaintiff stated that "[j]ust one" State Police officer interviewed him but that there were "so many people" there that he could not recall who conducted the interview. (*Id.* at 37). The

---

[5] Members of the CIU are "trained for hostage negotiation" and "review large-scale incidents that have occurred at several facilities in the past." (Dkt. No. 80-9, at 15). The CIU is activated "for large-scale disturbances, escapes and anything . . . that could . . . negatively affect the facility." (*Id.* at 16). Not every DOCCS facility has a CIU team, but there was a CIU team at Clinton. (*Id.* at 18). The CIU team at Clinton was comprised of approximately ten members. (*Id.* at 18–19). CIU members have a specific hat and jacket—the jacket has Crisis Intervention Unit printed on it, but not the individual member's name. (*Id.* at 20–21).

[6] Plaintiff could not recall whether the interviews had begun before the Governor's tour of the Honor Block. (Dkt. No. 80-7, at 33).

interview lasted "between 5 and 15 minutes." (*Id.* at 39). No force was used during this
interview. (*Id.* at 41). A correction officer escorted Plaintiff back to his cell. (*Id.*).

### 2.    Second Interview

"Not too long after the first" interview, Plaintiff could not approximate when, a different
correction officer escorted him to a second interview. (Dkt. No. 80-7, at 44–45). The second
interview also took place in the 4 company bubble. (*Id.*; Dkt. No. 90-3, at 1). Plaintiff could not
approximate how many individuals were there and did not "know who they were" but described
them as "[m]ostly . . . administration . . . [a] lot of gray pants." (Dkt. No. 80-7, at 45–46, 48).
The interview lasted "[a]bout ten minutes," and the "[o]ne or two" individuals conducting the
interview asked Plaintiff if he knew where Matt and Sweat were going and whether he had heard
anything. (*Id.* at 47–48). Plaintiff stated that he responded "'No' to everything," and told the
interviewers that "[y]ou can't smoke a cigarette on the company during gallery rec without
someone telling on you," and asked if they thought Matt and Sweat were going to "go out and
just start telling everybody their plans" because "[i]t doesn't happen." (*Id.* at 47). A correction
officer escorted Plaintiff back to his cell. (*Id.* at 48).

### 3.    Third Interview

"About ten minutes after 8 or 9:00" p.m.—four or five hours after the second interview—
Plaintiff was in his cell watching a movie, when the officer who "was watching the two cells" of
the escapees, "said they're coming for another one." (*Id.* at 49–50). Plaintiff "heard the chains
dragging on the floor." (*Id.* at 50). A correction officer removed Plaintiff from his cell,
handcuffed him "behind [his] back," and escorted him to a "little supply room" or "little storage
space[]" on the bottom floor. (*Id.* at 52, 56).

Including the correction officer who escorted Plaintiff (the "first correction officer"), there were three correction officers in the "little room."[7] (*Id.* at 53, 55–56). The first and second correction officers were wearing their uniforms with blue shirts. (*Id.* at 55). The third correction officer, in addition to his uniform, was wearing a CIU jacket and a "baseball hat." (*Id.* at 54–55). Plaintiff stated that the third correction officer "looked young, had no facial hair, glasses, or tattoos, was "[a]bout his height"—6'1" or 6'2"— white, and thin. (*Id.* at 54). The officers placed Plaintiff "in a corner" of the "little room." (*Id.* at 56). Plaintiff testified that the third correction officer—the one with "the jacket and the hat"— spoke first, and said, "you've been interviewed today a couple of times," asked Plaintiff if he knew "the difference" between "those interviews and this one," and leaned forward, saying, "IG ain't here now, IG is not here now."[8] (*Id.* at 56–57). The second correction officer then started "asking [Plaintiff] questions" and told Plaintiff that he "had to have heard something"; he then "pointed to a bag on the pipe" in the room and "said do you know what that's for. Do you know what waterboarding is, do you have any idea how fucking serious this is." (*Id.*). The third correction officer, the "one with the CIU jacket[,] jump[ed] out of his chair," grabbed Plaintiff by the throat, "lifted [him] out of the chair, [and] slammed [his] face into the bars, the pipes on the wall." (*Id.* at 58–59). At that point, the first and second correction officers "both jumped up and started hitting" Plaintiff. (*Id.* at 64). One of the officers "took the bag off the pipe and put it over [Plaintiff's] head and then they started beating [him] again." (*Id.* at 65). They tied the bag, which restricted Plaintiff's breathing, at the base of his neck. (*Id.* at 67, 72). Plaintiff was struck in the face, neck, stomach, chest, and ribs. (*Id.* at

---

[7] Plaintiff's deposition testimony regarding the positions of the corrections officers in the room—sitting or standing— conflicts at points, (*see, e.g.*, Dkt. No. 80-7, at 56–58), but is immaterial to the resolution of the summary judgment motions.

[8] "IG" is a reference to the Inspector General, now called the Office of Special Investigations. (Dkt. No. 80-7, at 118).

69). Plaintiff stated that while the correction officers were beating him, they were saying:

"Where are they going and how much are they paying you to keep your mouth shut." (*Id.* at 75).

The officers eventually stopped and the first correction officer returned Plaintiff to his cell. (*Id.*).

Plaintiff did not know the name of that officer because none of the officers were wearing

nametags. (*Id.*). According to Plaintiff, when he arrived "back upstairs," [t]he officer that was

guarding the two cells . . . was like holy shit, what happened to him." (*Id.*). Plaintiff's "eye was

busted open," his "lip was all messed up," and his "cheek was swollen." (*Id.* at 79).

### 4.    Fourth Interview

Ten to fifteen minutes later, Plaintiff was taken for a fourth interview in the "4 company

bubble." (*Id.* at 78). The same correction officer who escorted Plaintiff to the third interview also

escorted him to the fourth interview. (*Id.* at 78, 81). Plaintiff refused to be handcuffed, and the

officer allowed Plaintiff to walk with his hands in his pockets. (*Id.* at 81). Plaintiff was

interviewed again by the State Police—a man and a woman. (*Id.* at 81, 83). Plaintiff had not seen

either of the individuals who were conducting the fourth interview before. (*Id.* at 83). Plaintiff

stated that the man was wearing street clothes. (*Id.*). Plaintiff testified that when the male officer,

referring to Plaintiff's injuries, asked "what happened here," Plaintiff responded "come on, man,

you know what happened here." (*Id.* at 85). Plaintiff was escorted back to his cell after the

interview. (*Id.* at 86).

Plaintiff does not know the identities of the three officers who allegedly assaulted him

during the third interview. (Dkt. No. 80-1, ¶ 23; Dkt. No. 90-1). In the Amended Complaint,

Plaintiff identified Jason Hanson as one of the individuals who assaulted him, but Plaintiff

testified at his deposition that he had not heard Hanson's name before and did not know who he

was. (Dkt. No. 80-7, at 88–89). However, an Investigative Report by DOCCS Office of Special

Investigation ("OSI") Report, dated June 30, 2015, which Plaintiff submitted in response to

Hanson's motion for summary judgment, states that "Officer Hanson from CIU [was] identified as [one] of the staff who interviewed Inmate Alexander." (Dkt. No. 90-3, at 2–3). OSI prepared the report in response to a complaint by Plaintiff's mother that Plaintiff "was assaulted by staff at Clinton Correctional Facility on June 6, 2015," which OSI found to be "[u]nsubstantiated." (Dkt. No. 90-3, at 1).

### C.   Clinton Inmates Manuel Nunez, Dupreme Washington, and Paul Davila – Interviews and Reports of Excessive Force

In his affidavit, Manuel Nunez, who was an Honor Block inmate at the time of the escape, stated that after the escape, "inmates from the honor block were being taken from their cells and beaten up in a systematic fashion." (Dkt. No. 89-3). According to Nunez, "[i]nmates who were beaten up were yelling 'Don't go!'" and "they are beating us up!" and that he "heard this many times on the day of the escape and within a few days after." (*Id.*). Nunez observed that "the inmate in the neighboring cell . . . had bruises." (*Id.*). "Within a couple of days of the escape," Nunez saw Racette and told him "that men were being beaten up and were injured." (*Id.*). According to Nunez, Racette responded that he would "look into it." (*Id.*).

In his affidavit, Dupreme Washington, who was also an Honor Block inmate at the time of the escape, stated that during "the evening after the escape (Saturday)," he "heard numerous inmates be taken from their cells to interviews." (Dkt. No. 89-4). Washington stated that "[m]ost times" he heard "a scuffle break out with the inmate saying words to the effect of 'my hands are on the wall,' and 'I'm not resisting.'" (*Id.*). Washington, whose cell was next to Plaintiff's, noticed that when Plaintiff returned from the interview, he had "red marks and bruising on his face." (*Id.*).

Paul Davila, an inmate housed on the Honor Block at the time of the escape, stated in his affidavit that "[a]fter the escape, [he] was taken to be interrogated inside an A block control

room." (Dkt. No. 89-5). According to Davila, the control room was "plainly visible from the corridors of some of the companies in A block." (*Id.*). Davila asserts that he "was suffocated and beaten during the interrogation," returned to his cell, and then "taken for a second interrogation in the center room," where he was "again suffocated and beaten." (*Id.*). Davila states he was aware that other inmates "were beaten" because he "could see some were injured and they told" him. (*Id.*). Davila remained in the Honor Block "for approximately one week after the escape," and during that time, "complained to officers, supervisors, and investigators, to people in uniform, street clothes, and suits." (*Id.*). Davila also sent "a grievance on the day of [the] escape to Supt. Racette," but "[n]o one followed up." (*Id.*).

### D.  Defendant Correction Officer and CIU Member Jason Hanson – Inmate Interviews

During the relevant time period, Defendant Jason Hanson was a Clinton correction officer and assistant team leader of the Clinton CIU team.[9] (Dkt. No. 80-1, ¶ 24; Dkt. No. 90-1; Dkt. No. 80-9, at 9, 14, 23). Hanson "was not on duty" on June 6, 2015, but was "called to the facility" "for the possibility of an . . . escape." (Dkt. No. 80-9, at 60–61). Hanson arrived at the Facility at 6:00 or 6:30 a.m. (*Id.* at 62). Either Superintendent Racette or the CIU director, "activated" CIU team members, including Hanson and instructed them to report to the command center, where Hanson waited for instructions. (*Id.* at 31–33). Hanson, who was wearing his correction officer's uniform that day, stated that it is "possible" that he was wearing his CIU jacket but could not recall whether he wore his CIU hat. (*Id.* at 54). Hanson was assigned to

---

[9] As an assistant team leader, he was responsible for ensuring other members of his team carried out "their job duties, such as interviews," explaining that they "organiz[ed] information, passing on information as received to the decision makers so they can make a decision." (Dkt. No. 80-9, at 24). Hanson also had the authority to give other CIU members specific instructions. (*Id.*).

conduct investigatory interviews of inmates in connection with the escape and began interviewing inmates that day.[10] (*Id.* at 16, 34).

Hanson stated that the inmates in the Honor Block "that were closest to the escapees would've been [interviewed] first" and that they "worked [their] way throughout the entire [Honor] block," which housed between two and three hundred inmates at the time of the escape. (*Id.* at 44–45, 67). In addition to the nine or ten CIU team members, "multiple other agencies and officers and staff" conducted inmate interviews "at multiple times throughout that day." (*Id.* at 46, 49, 59).

As assistant team leader, Hanson "bounced in and out of multiple interviews," and conducted interviews. (*Id.* at 68–69). Hanson also interviewed non-Honor Block inmates— inmates who may have been "associated with the inmate escapees." (*Id.* at 59). If there were staff available, Hanson would ask "correction officers to escort the inmate" to him. (*Id.* at 50). If not, Hanson "would physically go . . . escort the inmate" to the interview. (*Id.*). Hanson stated that "in a lockdown situation, inmates would be handcuffed or moved wearing mechanical restraints" and that he could not recall if all inmates were in mechanical restraints but that they were "typically" in restraints. (*Id.* at 55–56). Hanson stated that the interviews were conducted in "whatever areas were available for interview such as disciplinary office[s]," and recalled using "the laundry area" "[a]t one point," explaining that the officers wanted to "to be able to talk to [the inmates] [and to keep] any information . . . private without . . . the other inmates hearing or being exposed to what this inmate" is saying. (*Id.* at 50–51). According to Hanson, there were no "expectations on what the inmates would" say but they were conducting the interviews "in an

---

[10] Hanson "may have been there for . . . duties other than just interviewing inmates," but could not recall what his other duties were that day. (Dkt. No. 80-9, at 43).

attempt to gain location or any information on these two escapees." (*Id.* at 48). Hanson testified that he would not describe the inmates as "cooperative or uncooperative" during the interviews, explaining that "[t]he inmates had little information about the escapees[,] [o]ther than that they were normal." (*Id.* at 72). Any information Hanson gathered through the interviews that was "pertinent" to the investigation "would have been relayed . . . through the proper chain of command," including Superintendent Racette or the director of CIU. (*Id.* at 65). Hanson interviewed "[m]any" inmates on June 6, 2015, but could not "give an accurate number." (*Id.* at 57). Hanson stated that he did not recall "doing interviews at late hours, anywhere past count time," which is approximately 9:00 p.m. (*Id.* at 63). Hanson was at the Facility until the early morning hours of June 7, 2015. (*Id.* at 62).

Hanson testified that he did not use physical force against any inmate on June 6, 2015 and that he did not believe "there were any uses of force [in his presence] that day." (*Id.* at 81). Hanson stated it was "possible that [he] participated in over four hundred" interviews during the escape. (*Id.* at 85). Hanson did not "recall specifically seeing" Superintendent Racette in the Honor Block that day, but stated that "due to the large number of people that were in the area, it is possible that he was there." (*Id.* at 66). Hanson testified that it was possible that he interviewed Alexander on June 6, 2015, but that he did not "recall him specifically." (*Id.*). Hanson is approximately 5' 10" tall and 220 pounds. (Dkt. No. 80-1, ¶ 25; Dkt. No. 90-1; Dkt. No. 80-9, at 9–10).

### E.   Defendant Superintendent Racette – Duties and Activities Following the Escape

As the Superintendent of Clinton, "it was [Racette's] duty to ensure the safety of the correction officers, as well as the inmates at the facility, and oversee the overall operation of the facility." (84-4, ¶ 1). The morning of Saturday, June 6, 2015, Racette, who typically worked

Monday through Friday, received a call from the Clinton watch commander that two inmates were missing. (Dkt. No. 89-7, at 11; Dkt. No. 84-4, ¶ 5). Racette immediately went to the Facility. (Dkt. No. 84-4, ¶ 5). He had "an hour commute." (Dkt. No. 89-7, at 28). When he arrived, Racette went to the watch commander's office for an update. (*Id.* at 29). The watch commander informed Racette that "two inmates were missing, that they were checking the tunnels," and that "that the facility had begun to implement the procedures of the Ready Emergency Data ('REDD') book, which is [the Facility's] emergency protocol." (*Id.* at 29; Dkt. No. 84-4, ¶ 5). Racette stated that prior to his arrival, "[p]ursuant to that protocol, [the] First Deputy Superintendent . . . began informing the chain of command in Albany Central Office that an escape had occurred." (Dkt. No. 84-4, ¶ 5). The watch commander informed Racette that "they were in the process of deploying [the Community Emergency Response Team] for the roadblocks" and "notifying the list of people that had to be notified," all of which "happened automatically out of the . . . REDD book." (Dkt. No. 89-7, at 31). Racette remained in the "watch commander's office observing what was going on" and receiving updates. (*Id.* at 30). Sometime "mid-morning," Racette went to the Honor Block and "looked at the holes in the back of the cells," from which the inmates escaped. (*Id.* at 47).

Late that morning, DOCCS Acting Commissioner Anthony Annucci and Deputy Commissioner for Correctional Facilities Joseph Bellnier arrived at the Facility. (Dkt. No. 84-4, ¶ 9). Annucci and Bellnier "are responsible for the operation and security of DOCCS correctional facilities across . . . New York." (*Id.*). Annucci and Bellnier were Racette's "superiors to whom [he] reported as Superintendent of Clinton." (*Id.*). Upon arrival, Annucci and Bellnier took over the direction of the investigation into the escape." (*Id.*). Racette "had no involvement with the decision-making process for determining how to investigate the escape,

12

including whether to conduct interviews" of Honor Block inmates. (*Id.*). Racette testified that Annucci and Bellnier were the only individuals who gave orders in response to the escape, that they gave him no orders, and that he himself gave no orders with respect to the response to the escape. (Dkt. No. 89-7, at 31–33).

Once it became known that Governor Cuomo was coming to the Facility, activities focused on "where [they were] going [to] have him, what's he going to want to do," and setting up for the Governor to speak to the press. (*Id.* at 37). Racette testified that during the time period before the Governor arrived, he was with Annucci and Bellnier, but only "along for the ride" as "they were making decisions." (*Id.* at 38). The Governor arrived at the Facility at approximately 2:00 p.m. (*Id.* at 33–34).

After the Governor arrived, Racette saw him "over at the Command Center," which is in the training building, between "the annex and the main." (*Id.* at 39–40). The Governor held a press conference; Racette attended. (*Id.* at 41). While the Governor was at the Facility, Racette's personal focus was "on the Governor being there." (*Id.* at 43). The Governor toured the Honor Block and the escapees' escape route. (*Id.* at 41). Racette did not recall whether he was with the Governor during the tour. (*Id.*). Racette testified that after the Governor left, as "the escape pursuit had been established," he sat with Annucci and Bellnier in his office "just waiting." (*Id.* at 43–44).

Racette was aware, at that point, that inmates were being interviewed. (Dkt. No. 89-7, at 44; Dkt. No. 84-4, ¶ 8). CIU, OSI, New York State Police, and the Bureau of Criminal Investigations "were present at the facility following the escape, and . . . were conducting inmate interviews concerning the escape." (Dkt. No. 84-4, ¶ 8; Dkt. No. 89-7, at 45–46). Racette "was not responsible for direction of the efforts of any of these entities to investigate the escape or

interview inmates. (Dkt. No. 84-4, ¶ 8). CIU and OSI staff reported to, and took direction from, their supervisors—Annucci or Bellnier. (*Id.*). Any "CIU staff who were Clinton employees would have reported to and taken direction from the CIU Director at DOCCS Central Office in Albany." (*Id.*). Racette neither conducted nor witnessed "any interviews in connection with the escape." (*Id.* ¶ 9). Racette left the Facility at 1:00 a.m. on June 7, 2015. (Dkt. No. 89-7, at 47).

Racette returned to the Facility the morning of June 7, 2015, and every day after until the escapees were captured. (*Id.* at 49, 51). Annucci and Bellnier were also at the Facility "for the entire time of the escape." (*Id.* at 49). After the first day of the escape, Racette "made rounds of every gallery," "looked at" and "talked to every single inmate," including the Honor Block inmates, and "made sure that the medical staff were out making rounds and talking to the inmates" and that the "legal mail was being delivered to inmates." (*Id.* at 51–52). "[N]o inmates complained to [Racette] that they were being mistreated or assaulted by correction officers" and Racette "did not observe any injuries on any of the inmates [he] visited." (Dkt. No. 84-4, ¶ 11).

Within days of the last escapee's capture, Racette was asked to retire. (Dkt. No. 89-7, at 50–51). Racette testified that he was not aware that there were allegations that corrections officers had assaulted inmates in connection with the escape until he "got served the lawsuit." (*Id.* at 59).

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## IV.   DISCUSSION

Defendants Hanson and Racette argue they are entitled to summary judgment because Plaintiff has failed to show they were personally involved in the alleged constitutional violations. Racette argues that his "only connection to this matter is that he held the role of Superintendent Clinton C.F. at the time of the June 2015 escape." (Dkt. No. 84-1, at 9).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (first quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); and then citing *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).

Personal involvement of a supervisory defendant may be shown in several ways. The Second Circuit has held that, in addition to (1) direct participation, a plaintiff may show that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring

(the "*Colon* factors"). *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986)).[11] "To succeed on a supervisory liability claim, a plaintiff must 'show an affirmative causal link between the supervisor's inaction and [the plaintiff's] injury.'" *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 114 (2d Cir. 2020) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 (2002))*.*

### A.    Defendant Racette

Plaintiff argues that Racette is liable under principles of supervisory liability for the alleged assault during the third interview. (Dkt. No. 89, at 1–5). Specifically, Plaintiff claims that Racette, as Superintendent of Clinton, is liable under the fourth and fifth *Colon* factors: "Racette had a duty to [] prevent the assaults from happening, and [to] ensure medical care was provided for the injured." (*Id.* at 4).

---

[11] The Second Circuit has not addressed the impact of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) on the *Colon* factors. *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (noting that the court need not decide "the contours of the supervisory liability test" in *Colon* because the plaintiff failed to meet the standards in *Colon*); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"). Here, as in *Raspardo* and *Grullon*, the Plaintiff has failed to meet the *Colon* standards.

### 1.   Fourth *Colon* Factor

Under the fourth *Colon* factor, Plaintiff must establish that Racette was "grossly negligent in supervising subordinates who committed the wrongful acts." *Colon*, 58 F.3d at 873. The Second Circuit has defined gross negligence as "conduct that demonstrates a 'heedless indifference to consequences to another,' meaning the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" *Estate of Chamberlain*, 960 F.3d at 114 (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991)). A constitutional violation is necessary to establish supervisory liability under the fourth *Colon* factor. *See Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

Plaintiff's claim fails because he has not adduced evidence of gross negligence. It is undisputed that Racette did not direct or supervise the interviews at Clinton on the day of the escape. Racette testified that on the day of the escape, he received reports and updates from the watch commander regarding the implementation of emergency procedures. (Dkt. No. 89-7, at 29–30; Dkt. No. 84-4, ¶ 5). Mid-morning, Racette went to the Honor Block to look at the escapees' cells, (Dkt. No. 89-7, at 47). Upon the arrival of Annucci and Bellnier—Racette's superiors—later that morning, he observed them take over "direction of the [response to the] escape," including giving orders and making decisions. (Dkt. No. 84-4, ¶ 6; Dkt. No. 89-7, at 32, 38). Racette later attended the Governor's press conference and, once "the escape pursuit had been established," waited in his office with Annucci and Bellnier. (Dkt. No. 89-7, at 43–44). Racette testified that he gave no orders in connection with the response to the escape. (*Id.* at 31–33). While Racette was aware inmate interviews were ongoing, (*id.* at 44), there is no evidence, as discussed further below, that he had reason to believe, on the day of the escape, that excessive force was being used during those interviews.

Thus, Plaintiff's attempt to establish personal involvement under the fourth *Colon* factor fails. *Colon*, 58 F.3d at 873–74 (explaining that the plaintiff's evidence "contains nothing that would support a claim that [the supervisory defendant] either knew or should have known of the events of which [the plaintiff] complains" and that "[i]n the absence of such facts, there is no basis for a jury finding of gross negligence (or deliberate indifference), and summary judgment is proper").

### 2.      Fifth *Colon* Factor

Under the fifth *Colon* factor, "a supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring . . . provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and h[is] injury." *Poe*, 282 F.3d at 140. Plaintiff asserts there is evidence that "it was common knowledge throughout the [Honor] [B]lock" that inmates were being assaulted and that Racette acknowledged speaking to "every single inmate." (Dkt. No. 89, at 4). However, there is no evidence that Racette was aware, at any point on June 6, 2015—the day of the escape and Plaintiff's alleged assault—that inmates were being assaulted during interviews. Racette was aware there were ongoing interviews, (Dkt. No. 89-7, at 44; Dkt. No. 84-4, ¶ 8), but there is no evidence that he observed any of the interviews or was in a place on the premises where he would have observed the interviews. Racette acknowledged being in the Honor Block "mid-morning" to look at the cell from which the inmates escaped, (Dkt. No. 89-7, at 47), but Plaintiff testified that his interview was at 8:10 or 9:10 p.m., (Dkt. No. 80-7, at 49–50). Inmate Nunez stated in his affidavit that after the escape "inmates from the honor block were being taken from their cells and being beaten up in a systematic fashion" and that he heard inmates yelling "Don't go!" and "they are beating us up!" "many times" on the day of the escape. (Dkt. No. 89-3). Neither Inmate Nunez, nor anyone else, however, testified that Racette

was in the Honor Block when an inmate yelled "they are beating us up." Further, although

Racette testified to being in the Honor Block, "mid-morning," there is no evidence that this was

one of the "many times" inmates were yelling that they were being beaten or that Racette heard

the inmates. Because there is no evidence that Racette even heard the inmates' yells at all, this

evidence is insufficient to establish his awareness that they were being beaten. *See, e.g.*,

*Fernandez v. City of New York*, No. 17-cv-789, 2020 WL 2086191, at *19, 2020 U.S. Dist.

LEXIS 76218, at *51 (S.D.N.Y. Apr. 30, 2020) (granting summary judgment and dismissing

supervisory liability claim where the defendant sergeant "was in the vicinity and aware that [the

plaintiffs] were 'yelling out while they were in the cells'" but "no evidence that [the defendant

sergeant] was aware that Plaintiffs were yelling out because of pain caused by their handcuffs").

The affidavit of Inmate Davila similarly fails to establish that Racette was aware of

ongoing constitutional deprivations. Inmate Davila stated that he was interrogated inside an

Honor Block control room, which was "plainly visible from the corridors of some of the

companies in" the Honor Block, but he provided no time-frame for his interrogation. (Dkt. No.

89-5). It would therefore be speculative, and not a "reasonable inference" to conclude that

Racette observed Davila's beating during his mid-morning visit to the Honor Block. Davila

stated he complained to "everyone," (Dkt. No. 89-5), but that statement is vague and does not

allow an inference that Davila complained to Racette or that Racette heard of his complaints.

And although Davila stated he sent a grievance to Racette on the day of the escape, (Dkt. No. 89-

5), there is no indication at what point in the day he did so or what the grievance alleged, nor is

there any evidence that Racette ever received the grievance. *Burroughs v. Petrone*, 138 F. Supp.

3d 182, 221 (N.D.N.Y. 2015) (finding the complaint "failed to establish that [the defendants]

were personally involved in any constitutional deprivation" where the plaintiff "refers generally

to letters sent to these defendants but fails to plead facts establishing where the letters were sent or by what means they were forwarded").

Plaintiff also relies on Inmate Nunez's statement that he told Racette that inmates were being beaten. (Dkt. No. 89, at 3). However, Nunez indicated that he told this to Racette *after* Plaintiff was allegedly subjected to excessive force on the day of the escape. (*See* Dkt. No. 98-3 (Nunez stating that "within a couple days of the escape," he told Racette "that men were being beaten up and were injured")). Likewise, Plaintiff's reliance on Racette's acknowledgement that he spoke with every inmate in the Facility is unavailing because Racette testified that he started making rounds of the Facility after the first day of the escape, and thus well after the alleged constitutional deprivations occurred. (Dkt. No. 89-7, at 51).

Plaintiff, therefore, has failed to identify evidence that would allow a conclusion that Racette, even as Superintendent, "had actual or constructive notice" that Honor Block inmates were being beaten. *Cf. McCann v. Coughlin*, 698 F.2d 112, 125 (2d Cir. 1983) (holding that a prison commissioner and superintendent could be held liable for their gross negligence and deliberate indifference to the constitutional rights of inmates, as indicated by their having actual or constructive notice that unconstitutional practices were taking place, and their failure to act on the basis of this information); *see also Poe*, 282 F.3d at 143 ("But here there are no facts indicating that Leonard had constructive notice of Pearl's problematic history or knowledge of any facts that should have compelled him to inquire into Pearl's background."); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("Nor can Coughlin be held personally responsible simply because he was in a high position of authority in the prison system." (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).

As there is no evidence from which a factfinder could conclude Racette had any information that unconstitutional acts—excessive force used against inmates during interrogations about the escape—were occurring, Plaintiff has failed to establish the personal involvement of Defendant Racette and his § 1983 claim against him fails as a matter of law.[12]

### B.    Defendant Hanson

Defendant Hanson moves for summary judgment on the ground that Plaintiff has failed to adduce evidence that he directly participated, and thus was personally involved, in the third interview during which the alleged excessive force occurred. It is undisputed that Plaintiff cannot identify the officers involved in the third interview. However, a § 1983 plaintiff's "inability to positively identify those who allegedly violated his rights is not *per se* fatal to his claims." *Shankle v. Andreone*, No. 06-cv-487, 2009 WL 3111761, at *5, 2009 U.S. Dist. LEXIS 88293, at *16 (E.D.N.Y. Sept. 25, 2009) (quoting *Davis v. Callaway*, No. 05-cv-00127, 2007 WL 1079988, at *8, 2007 U.S. Dist. LEXIS 29468, at *24 (D. Conn. April 9, 2007)). "This is especially true where the acts complained of by the plaintiff, if true . . . are likely to have prevented plaintiff from identifying which of three defendant officers specifically engaged in the bad acts." *Shankle*, 2009 WL 3111761, at *5, 2009 U.S. Dist. LEXIS 88293, at *16.

Plaintiff has presented evidence that he was assaulted by a correction officer wearing a CIU jacket without a nametag and that a bag was placed over his head for much of the assault.

---

[12] Plaintiff argues that "[]under the 'law of the case doctrine,'" the Court's ruling on supervisory liability in addressing Racette's prior motion to dismiss precludes this Court from departing from its earlier ruling. (Dkt. No. 89, at 5). In denying Racette's motion to dismiss, the Court concluded that Plaintiff plausibly alleged that Racette "had reason to know" from the aftermath surrounding the escaped inmates, which enveloped the facility, of the alleged constitutional violations. *Alexander v. Cuomo*, No. 17-cv-309, 2018 WL 2041576, at *6, 2018 U.S. Dist. LEXIS 219712, at *17–19 (N.D.N.Y. Feb. 26, 2018). Plaintiff, however, has not cited record evidence that would support such a conclusion here—at the summary judgment stage. Indeed, the Second Circuit has held that the doctrine of law of the case "would not preclude a district court from granting summary judgment based on evidence after denying a motion to dismiss based only on the plaintiff's allegations." *Maraschiello v. City of Buffalo Police Dep't*, 709 F.3d 87, 97 (2d Cir. 2013). Thus, Plaintiff's argument is without merit.

There are, therefore triable issues of fact as to whether these acts prevented him from identifying the CIU officer engaged in the interview and use of force. *See Shankle*, 2009 WL 3111761, at *5, 2009 U.S. Dist. LEXIS 88293, at *15–17 (rejecting the defendant's argument that summary judgment was appropriate based on the plaintiff's inability "to identify the particular officers who subjected him to excessive force" in light of evidence that the officers engaged in excessive force sprayed "mace to the eyes," stood on the plaintiff's back, and "mush[ed]" his face to the ground). There is also evidence from the DOCCS OSI report that Hanson was involved in the third interview, *see* Dkt. No. 90-3, at 2 ("Officer Hanson from CIU [was] identified as the staff who interviewed Inmate Alexander."), that Hanson may have worn his CIU jacket that day, and that the jacket does not have a nametag. (Dkt. No. 80-9, at 21, 54). These facts are sufficient to raise a triable issue of fact as to whether Hanson was personally involved in the third interview and the alleged use of force. *See De Michele v. City of New York*, No. 09-cv-9334, 2012 WL 4354763, at *16–17, 2012 U.S. Dist. LEXIS 136460, at *53 (S.D.N.Y. Sept. 24, 2012) (denying the defendants' motion for summary judgment on excessive force claim where officers' presence at time of arrest was undisputed and events as plaintiff described them would have "prevent[ed] him for [sic] seeing which officers were taking what actions"); *Hamilton v. City of Peekskill Police Dep't*, No. 13-cv-8138, 2015 WL 4635692, at *3, 2015 U.S. Dist. LEXIS 101903, at *8 (S.D.N.Y. Aug. 3, 2015) ("Though she was unable to identify the officers, a reasonable jury could infer that Agovino and Labodin both perpetrated the attack because they conceded that they were the officers on the scene.").

Although Hanson has no independent recollection of interviewing Plaintiff, and denies using force at any time, he testified that he was involved in interviewing hundreds of Honor Block inmates on the day of the escape. Based on this evidence, the Court concludes there are

triable issue of fact as to whether Plaintiff was prevented from identifying the correction officers involved in the alleged excessive force and whether Hanson was personally involved in the alleged constitutional violation.

Finally, Hanson, who is 5'10," argues that Plaintiff's testimony that the correction officer wearing the CIU jacket who assaulted him was 6'1" or 6'2" is insufficient to allow a factfinder to conclude he was involved. (Dkt. No. 80-1, ¶ 25; Dkt. No. 90-1; Dkt. No. 80-9, at 9–10). As Plaintiff has presented evidence that Hanson, a CIU member, was involved in the third interview, that a CIU member participated in the interview, and that Hanson was wearing a CIU jacket, whether, as Hanson argues, Plaintiff's testimony about Hanson's height "effectively eliminates Defendant Hanson from consideration," (Dkt. No. 94, at 6), is a factual question for a jury to consider.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the motion for summary judgment filed by Defendants Steven Racette, Donald Mitchell, Michael Bertone, Dylan Humphrey, and David Thacker (Dkt. No. 84) is **GRANTED**; and it is further

**ORDERED** that Defendants Steven Racette, Donald Mitchell, Michael Bertone, Dylan Humphrey, and David Thacker, are **DISMISSED** as Defendants in this case; and it is further

**ORDERED** that the First Amendment Claim (the Sixth Cause of Action) is **DISMISSED**; and it is further

**ORDERED** that Defendant Jason Hanson's motion for summary judgment (Dkt. No. 80)

is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 29, 2020
        Syracuse, New York


Brenda K. Sannes
U.S. District Judge